**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**ERIC B., Defendant–Appellant.**

No. 94–10588.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 13, 1995.

Decided May 30, 1996.

Celia Rumann, Assistant Federal Public Defender, Phoenix, Arizona, for defendant-appellant.

Vincent Q. Kirby, Assistant United States Attorney, Phoenix, Arizona, for plaintiff-appellee.

Before: WIGGINS and LEAVY, Circuit Judges, and MANUEL L. REAL,* District Judge.

MANUEL L. REAL, District Judge:

On September 7, 1994, Eric B., who at the time was twelve-years-old, killed a seven-year-old child on a Navajo Indian Reservation in Arizona. The cause of death was a single bullet to the head. Eric B. was tried and adjudicated a juvenile delinquent. The court found that Eric B. had committed an act of involuntary manslaughter under 18 U.S.C. § 1112.

Eric B. now appeals claiming a violation of the Speedy Trial Act (Act), under 18 U.S.C. § 5036. In addition, Eric B. asks us to find that the district court erred by (1) denying his motion for judgment of acquittal; (2) failing to find the United States Attorney impermissibly obtained a grand jury subpoena; and (3) failing to find that Eric B.'s privacy right provided for under, inter alia, 18 U.S.C. § 5038 was violated.[1]

We have jurisdiction pursuant to 28 U.S.C. § 1291, based on the entry of final judgment by the district court on December 12, 1994. Having considered the pleadings and argument before this Court, we affirm the district court's decision.

## I.

### FACTS

On the afternoon of September 7, 1994, Eric B., then twelve-years-old, received a gun from a friend at school. Eric B. was aware that two bullets were in the weapon when he took possession of the gun.

Beginning on his bus ride home from school to Chilchinbeto, a small Navajo community in Arizona, and throughout the rest of the afternoon, Eric B. showed the gun to several of his schoolmates. After arriving in Chilchinbeto, Eric B. showed the gun to a ten-year-old named Jimmy Sharkey. Aware that the gun was loaded, Eric B. pointed the gun at Jimmy. Shortly thereafter, Eric B. and Jimmy went to a field, where Eric B. shot one bullet at some rocks. Eric B. then unscrewed the barrel, dropped the spent casing on the ground, removed the one remaining bullet and put it in his pocket.

Eric B. went on to have several encounters with other juveniles in which Eric B. would point the gun at the person and pull the trigger. Samantha Charlie, a fifteen-year-old, was one such person. After pointing the empty gun at Samantha, Eric B. pulled the remaining bullet from his pocket and put it back in the gun. Eric B. then offered the gun to Samantha and suggested she go shoot Tamara Zonnie, one of Samantha's friends.

Next, Eric B. took the now loaded gun and came across eleven-year-old Myron Redmoustache. Eric B. pointed the loaded gun at Myron and pulled the trigger. The gun did not fire.

Finally, just minutes after leaving Myron, Eric B. came across some juveniles playing in an area known as "the bridge." One of these juveniles was seven-year-old Nathan Crank. Eric B. pointed the gun at Nathan and shot him in the forehead. Eric B. then gave the gun to a boy named Tyrell and instructed him to hide the gun.

Within a few hours of the shooting, tribal police arrested Eric B. and placed him in custody. That evening tribal authorities notified the FBI of the shooting. On September 8, 1994, the FBI contacted the United States Attorney and the tribal authorities about the case. The grand jury issued a

---

* Hon. Manuel L. Real, United States District Judge for the Central District of California, sitting by designation.

1. Appellant also bases this privacy violation claim on the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution.

subpoena for Eric B.'s school records on September 9, 1994, and FBI agents met with tribal authorities on that same day. FBI agents stayed in Chilchinbeto until the 10th of September, during which time the FBI requested information regarding any prior juvenile adjudication Eric B. may have had.

On September 12, 1994, an FBI agent interviewed the juvenile who had given Eric B. the gun. On that same day, the agent interviewed Eric B. and received documentation from tribal authorities that Eric B. had no prior delinquency history. The FBI never undertook jurisdiction of the case, leaving the matter to the tribal court.

On September 15, 1994, the United States Attorney filed an Information charging the juvenile with committing an act of delinquency—second degree murder. Federal authorities arrested and placed Eric B. into federal custody on September 16, 1994, Eric B. making his initial appearance that same day. Trial was later set for October 14, 1994.

At trial the district court found Eric B. did not commit second degree murder. The court held that the government had proven the lesser included offense of involuntary manslaughter, under 18 U.S.C. § 1112.

The district court held a disposition hearing on December 12, 1994, at which time it permitted the victim's family to be present. The district court also received several letters from the public expressing concern about the facts of the case and beseeching the court to ensure justice was done.

## II.

### DISCUSSION

#### A.

##### APPELLANT'S RIGHT TO A SPEEDY TRIAL UNDER 18 U.S.C. § 5036

■ We first address whether Eric B.'s speedy trial rights under the Act were violated. This is a mixed question of law and fact, and therefore the appropriate standard of review is *de novo*. *United States v. McConney*, 728 F.2d 1195 (9th Cir.) *(en banc)*, *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

The Act provides for the number of days that may elapse before a juvenile must be brought to trial, if the juvenile is being detained pending trial. The applicable section, 18 U.S.C. § 5036, specifies:

If an alleged delinquent who is in detention pending trial is not brought to trial within thirty days from the date upon which such detention was begun, the information shall be dismissed on motion of the alleged delinquent or at the direction of the court, unless the Attorney General shows that additional delay was caused by the juvenile or his counsel, or consented to by the juvenile and his counsel, or would be in the interest of justice in the particular case. Delays attributable solely to court calendar congestion may not be considered in the interest of justice. Except in extraordinary circumstances, an information dismissed under this section may not be reinstituted.

■ According to Eric B., the government failed to bring this case to trial within this thirty day requirement. Tribal authorities arrested Eric B. on September 7, 1994. Five days later, on September 12, the FBI possessed all documentation necessary for certification, which is a statutory prerequisite for proceeding against a juvenile in federal court. *See* 18 U.S.C. § 5032. Eric B. was placed into federal custody four days later, on September 16, 1994.

Eric B. contends in this case that the clock started to run either on September 9 or, at the very latest, September 12. As such, because trial commenced on October 14, 1994, a minimum of thirty-two days elapsed before the juvenile was brought to trial. Consequently, even calculating the time in a manner most favorable to the government, this two day delay violated Eric B.'s right to a speedy trial under the Act.

To escape the clock from starting on September 16, which would result in a finding that no violation of the Act occurred, Eric B. relies heavily on *United States v. Andy*, 549 F.2d 1281 (9th Cir.1977). In *Andy* state authorities first detained the juvenile for seventeen days before surrendering jurisdiction to federal authorities. There, despite trial

having commenced within thirty days of the juvenile being taken into federal custody, the court remanded the case to the district court to determine whether a violation of § 5036 may have occurred.

Believing it necessary to harmonize §§ 5032 and 5036, *Andy* articulated a new test to calculate the thirty day period. *Andy* held that the clock may begin from either:

> (1) the date that the Attorney General certifies, *or in the exercise of reasonable diligence, could have certified*, to the conditions stated in Section 5032, or (2) the date upon which the Government formally assumes jurisdiction over the juvenile, whichever event earlier occurs.

*Id.*, at 1283. The case was then remanded to district court in order to apply this new standard.

Here, Eric B. contends that the Attorney General had all documentation necessary on September 12 and could have certified the matter that day. Eric B. concludes, therefore, September 12 is the date we should use when calculating the thirty day period. Not satisfied with September 12 date, however, Eric B. urges us to designate an even earlier date, September 9, two days after tribal authorities arrested the juvenile, as the date on which the clock started to run.

■ At the outset we note that the September 9 date argued for by Eric B. ignores the express language in § 5032, which prohibited proceedings from commencing on that date because the government did not yet possess the necessary documentation.[2] This statutory condition precedent to the commencement of proceedings against Eric B. did not occur until September 12, 1994, when the government received documentation that Eric B. had not been previously adjudicated delinquent. Therefore Eric B.'s position with respect to the September 9 date must be rejected.

In looking at the September 12 date, several reasons cause us to conclude there was no violation of the Act in this case. Most simply, federal authorities took Eric B. into *federal custody* on September 16, 1994, twenty-eight days before trial commenced. This is the most obvious basis for finding no violation of the Act. But to solely rely on this ground would necessarily bypass the test articulated in *Andy*. Based on the facts of this case, it is unnecessary for us to opine whether the plain language of §§ 5032 and 5036 is consistent with the test established in *Andy*.[3] We reject Eric B.'s argument regarding the Act on several grounds that we believe are consistent both with the Act and the holding in *Andy*.

First, distinguishable from *Andy* where more than 30 days had passed from the date the state formally relinquished jurisdiction but kept the juvenile in state custody—and the date Eric B. was brought to trial, the trial in this case occurred within thirty days of the assertion of federal jurisdiction. A five day "gray" period existed in *Andy* due to the state court's method of ceding jurisdiction, because its order was to be effective five days after it was issued. Thus, the facts present in *Andy* raise the question of interpreting who has jurisdiction when an order is entered but is "effective" at a later date. The question stated differently is: Under the Act, what is the jurisdictional status of a juvenile being detained by state authorities after a state court has officially surrendered jurisdiction but imposes a legal "fiction" as to the effective date? In that factual circumstance, policy may mandate a finding that those days be tacked on when calculating the thirty day period. But we need not address this question presently.

In this case the juvenile experienced no such black hole. Federal authorities asserted and had jurisdiction over Eric B. once

---

**2.** § 5032 states, in part, that "[a]ny proceedings against a juvenile under this chapter or as an adult shall not be commenced until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record, or that the juvenile's record is unavailable and why it is unavailable."

**3.** *See Andy*, at 1282—1283 (Trask, J., dissenting). We do note, though, as did the court in *United States v. Baker*, 10 F.3d 1374, 1397 fn. 7 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994), that the test under *Andy* has been criticized as being inconsistent with the plain language of § 5036.

they placed him in federal custody on September 16, 1994; trial commenced twenty-eight days thereafter.

In calculating the thirty day period, we do not read *Andy* to require an automatic tacking on of days that the juvenile spends in state custody. *Andy* did not instruct the district court on remand to add the days spent in state custody to those days spent in federal custody. The task of the district court simply was to assess whether, under the new test, federal authorities using reasonable diligence could have certified at a point outside the thirty day period.[4]

Looking to whether federal authorities in the exercise of reasonable diligence could have certified the case on September 12, we take instruction from and give weight to the language contained in § 5032, which expressly provides for the Attorney General to *investigate* whether the case is appropriate for federal court, prior to certification.[5] The statute explicitly recognizes the Attorney General's (and implicitly other law enforcement's) responsibility to make a well-informed decision whether to proceed against a juvenile in federal court.

Proceedings could not have commenced until September 12 because of the statutory pre-conditions referred to above. In this case, Eric B. presents no evidence demonstrating that the government failed to investigate in an expeditious manner. It is beyond cavil that a prosecutor should be given a reasonable amount of time to investigate and reflect on potential charging decisions in a case, especially involving a twelve-year-old child. To hold otherwise would place the prosecutor in a position of erring on the side of filing charges out of fear of becoming

susceptible to a claim that the government failed to use reasonable diligence in filing. Interpreting the Act to promote inadequate investigation and sanction prosecutors to race to bring a federal action against a juvenile is contrary to the history and purpose of separate classification for juvenile offenders.[6]

Thus, while framed differently, really Eric B. is urging us to hold that the United States Attorney in this case acted *unreasonably* by not certifying to the district court on September 12 the factors mandated by § 5032—thirty-two days before trial started. We cannot on this record assume the Act was violated by two days.

Eric B. argues in a conclusory fashion that the government acted unreasonably in not assuming jurisdiction and certifying this case on September 12—the very day federal authorities were permitted to proceed. This would have been only five days after the shooting; and it appears from the record that no federal agent was even at the scene until September 9.

Here, the government filed an Information three days after it was permitted to do so. Eric B. was charged eight days after the shooting. This period of time is consistent with § 5032's language providing for investigation prior to proceeding against a juvenile, and this section in conjunction with § 5036 should not be read to require otherwise. We do not believe *Andy* stands for the proposition that the government forfeits its right to thoroughly investigate a case and have a reasonable amount of time to make a fully-informed decision whether to proceed against a juvenile.

4. We point out the obvious that the district court in *Andy* of course did not apply this test when it made its initial ruling on the issue of a violation of the Act. However, this is not the case here, because the district court has already applied the test previously established in *Andy*, but in the end rejected appellant's contentions.

5. A juvenile shall not be proceeded against "unless the Attorney General, *after investigation*, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of

juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in section ... and that there is a *substantial Federal interest* in the case or the offense to warrant the exercise of federal jurisdiction." (Emphasis added.)

6. Counsel asks us to draw an arbitrary line for prescribing the appropriate duration of the government's investigation of this and other cases. This we will not do, especially on the facts of this case.

■ The government offers two other grounds to support a finding that the Act was not violated. First, the Act provides for excludable time. Time is excluded for delay "caused by the juvenile or his counsel." 18 U.S.C. § 5036.[7] Excludable time may exist if the delay is caused by motions that are filed on the juvenile's behalf. *U.S. v. Juvenile Male,* 939 F.2d 321 (6th Cir.1991) (instructing that even if the Speedy Trial Act applied, appellant's motion to dismiss in the district court "tolled" the running of that time for several days under the Act).

Eric B. in this case filed a Notice of Appeal of Detention Order on September 22, 1994.[8] The district court affirmed the order of detention on September 27. And on both September 30 and October 6, Eric B. filed a Motion for Release. Both motions were denied. Thus, the government contends that eight days should be excluded due to delay caused by Eric B.'s motions. We agree. At the very least, two days should be excluded from the calculation based on the motions filed by Eric B.'s counsel.

Finally, the government argues that defense counsel implicitly consented to days exceeding the thirty day limit, by agreeing to the October 14, 1994 trial date. Originally, the district court set trial for October 16, 1994, thirty days after Eric B. was taken into federal custody. However, at the September 22 pre-trial conference, the court moved the trial to Friday, October 14, because October 16 fell on a Sunday. Defense counsel did not object to this date.[9] Moreover, Eric B. has never indicated prejudice from the claimed delay of two days. Thus, the interest of justice is well met here by allowing for any claimed delay to pass statutory speedy trial muster.

On all subsequent appearances before the district court, defense counsel never objected to the October 14 trial date. It was not until the day of trial that defense counsel filed a Motion to Dismiss for violation of the Act. This conduct, according to the government, amounted to defense counsel's waiver of any thirty day violation in this case and a finding that any delay was the product of Eric B.'s counsel. It would seem at best to be sandbagging.

In response, Eric B.'s counsel denies that she affirmatively agreed to the trial date, and notes the government fails to direct this Court to any part of the record establishing this claim. Additionally, it did not become clear that the government did not act with due diligence in proceeding with this case until testimony was received at trial. Consequently, Eric B.'s counsel asserts that she acted in good faith based on the information available at the time.[10] Eric B.'s counsel also notes that there could be no affirmative obligation to alert the court had counsel known of the problem earlier. This would have violated counsel's ethical obligation to her client and Eric B.'s Sixth Amendment right to effective assistance of counsel.[11]

Because we have determined that there was no violation under the Act based on the above analysis, we need not address this basis for affirming the district court's decision. However, we do note that the conduct by Eric B.'s counsel is questionable and continued to be suspect in the appeal process. Eric B.'s counsel's recitation of the facts in her brief are misleading, at best, pushing the limits of advocacy in trying to underscore advantageous facts and downplay—or leave out—damaging ones. When confronted by this during argument on appeal, counsel seemed unfazed by the Court's admonition.

---

7. The Act also permits additional delay past the thirty-days "in the interests of justice." *Id.*

8. Additionally, on September 26, the Court, with defense counsel's consent, ordered a psychological examination of the juvenile for September 27.

9. *See United States v. Gonzalez–Gonzalez,* 522 F.2d 1040 (1975) (raising the question, but not answering, whether defense counsel's statement that trial date was "convenient" creates a duty to inform the court that counsel would nevertheless move to dismiss for violating speedy trial statute).

10. It strains credulity to think the facts Eric B. alleges as to the government's failure to act with due diligence became known only at trial.

11. As an officer of the court, counsel would be compelled to advise the court of such information. This information does not impact effective assistance of counsel or disclose confidential communications.

## B.

### *THE DISTRICT COURT'S FINDING OF JUVENILE DELINQUENCY*

■ A district court's denial of a motion for judgment of acquittal is reviewed in the same manner as a challenge to the sufficiency of the evidence. *United States v. Shirley,* 884 F.2d 1130, 1134 (9th Cir.1989). Thus, "[t]his court must review the evidence presented against the defendant in a light most favorable to the government to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Lim,* 984 F.2d 331, 337 (9th Cir.), *cert. denied,* 508 U.S. 965, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in the original).

After a one day trial, the district court found Eric B. not guilty of second degree murder under 18 U.S.C. § 1111. However, the district court did find the government had proven beyond a reasonable doubt defendant was guilty of the lesser included offense of involuntary manslaughter. *See* 18 U.S.C. § 1112.

■ Eric B. claims the government presented insufficient evidence to prove the requisite elements of involuntary manslaughter. Specifically, the evidence failed to support the court's finding that Eric B.'s actions demonstrated "a wanton and reckless disregard for human life." [12]

To that end, counsel for Eric B. claims the juvenile had neither "actual knowledge that his conduct was a threat to the lives of others" nor did he have "knowledge of such circumstances as could reasonably be said to have made foreseeable to him the peril to which his acts might subject others." *United States v. Keith,* 605 F.2d 462 (9th Cir.1979) (citing *United States v. Pardee,* 368 F.2d 368 (4th Cir.1966)). Eric B. claims that due to

his age and intelligence level he did not fully understand the consequences of his actions. Further, according to Eric B., the government did not present evidence that he, in fact, realized the bullet was in the gun at the time of the shooting. Plainly stated, Eric B. would have us find on this record that as a matter of law the shooting was an accident, and he did not understand the danger present in playing with the gun in this manner.

Contrary to argument that Eric B. did not foresee his acts creating peril for others, the government points to Eric B.'s conduct and testimony concerning such conduct. Eric B. knew the gun contained two bullets after he received it. He pointed the loaded gun at Jimmy Sharkey and shortly thereafter fired it at some rocks. After the gun went off, Eric B. unscrewed the cylinder, dropped the spent casing on the ground and put the remaining bullet in his pocket.

These acts alone demonstrate that the juvenile had a sufficient degree of sophistication and understanding of the gun's operation, and the corresponding cause and effect of firing a loaded weapon, to foresee the consequences of his actions and the peril created by aiming a loaded gun at another human being. Later, Eric B. again pointed the gun at another child, Samantha Charley, and she heard the trigger being pulled. Eric B. showed her the gun, put in the remaining bullet and told her to go shoot Tamara Zonnie. Eric B. repeated this exact conduct with Myron Redmoustache, but this time the gun was loaded. It did not go off. [13]

Eric B.'s final act simply repeated the same conduct which he had engaged in throughout that day. But this time, Eric B. pointed the gun at a seven-year-old boy and shot him in the head. He intended to point the gun at the victim and he pulled the trigger just like he had several times before.

The circumstances leading up to the fatal shot and the final act itself demonstrate more than sufficient evidence to conclude that Eric

---

**12.** Involuntary manslaughter is defined as "an unintentional killing that evinces a wanton or reckless disregard for human life, but not of the extreme nature that will support a finding of malice." *United States v. Paul,* 37 F.3d 496, 499 (9th Cir.1994) (citing *United States v. Lesina,* 833

F.2d 156 (9th Cir.1987)) (internal quotations omitted).

**13.** Eric B. completely leaves this out of his statement of facts.

B. reasonably foresaw his acts created peril to the victim. Therefore, the district court correctly denied Eric B.'s motion for judgment of acquittal.

## C.

### THE GOVERNMENT'S USE OF THE GRAND JURY TO "INVESTIGATE" THIS CASE

■ Eric B. next contends that the government improperly used the grand jury by having it issue a subpoena for Eric B.'s school records, constituting an illegal investigation. After the grand jury received said records, the government moved pursuant to Fed.R.Crim.P. 6(e) to release the records to Pretrial Services. Questions of prosecutorial misconduct involving mixed questions of both fact and law are reviewed de novo. United States v. De Rosa, 783 F.2d 1401 (9th Cir.), cert. denied, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

At the outset, we recognize that nowhere in the record does it appear that these records were offered as evidence at trial. To the contrary, the government asserts, and Eric B. does not contest, that these school records were never used to adjudicate delinquency. Apparently, these school records were only used to prepare a psychological report concerning Eric B. and were incorporated into the disposition report. Eric B.'s counsel never objected to the use of the records for these purposes and thus waived this issue as grounds for setting aside the finding of delinquency. Counsel's failure to object to this alleged defect in the proceedings constitutes waiver of the right to raise this issue on appeal. U.S. v. Visman, 919 F.2d 1390 (9th Cir.1990) (recognizing that failure to object to information in the presentence report prohibits raising the issue anew on appeal).

■ Moreover, even if we were to find that this issue is properly before us, and employ the appropriate "plain error" standard applicable in cases where a timely objection is not made, U.S. v. Hernandez–Rodriguez, 975 F.2d 622 (9th Cir.1992), Eric B.'s claim must be rejected. When analyzing if a defect rises to the level of plain error, a court must assess whether the claimed error is highly prejudicial, affecting substantial rights. Id., at 628. No plain error exists in this case.

Eric B. fails to demonstrate any prejudice whatsoever impacting substantial rights due to the acquisition of school records via the grand jury subpoena. Counsel's argument is an exercise in rhetoric, and is noticeably silent as to any specific harm. Eric B.'s argument is as follows: Since this case involved a twelve-year-old who could not be criminally prosecuted under any circumstances, it was improper for the grand jury to subpoena the juvenile's school records. Powers of the grand jury are limited to returning or not returning indictments in federal criminal matters. And, because this case was not a criminal matter due to the juvenile status of Eric B., the grand jury could not choose to indict or not indict. As such, counsel's argument contends that the government was merely using the grand jury as a tool for investigation, which is clearly improper. United States v. Woods, 544 F.2d 242 (6th Cir.1976); United States v. Star, 470 F.2d 1214 (9th Cir.1972).

Notwithstanding this argument, Eric B. has failed to demonstrate any prejudice resulting from the acquisition of the school records. He concludes that this claimed impropriety warrants dismissal.[14] It is not necessary for us to decide to what extent, if at all, a grand jury may participate in investigating a juvenile who is suspected to have committed a crime.[15] Here, the juvenile makes no showing of prejudice. United States v. Mechanik, 475 U.S. 66, 72, 106 S.Ct. 938, 942–43, 89 L.Ed.2d 50 (1986); United States v. Lim, 984 F.2d at 335. See Fed. R.Crim.P. 52 ("any error, defect, irregularity

14. Interestingly, appellant notes that some constitutional protections, "most notably the right to indictment by a grand jury," are not afforded to juveniles. See Appellant's Opening Brief (App. Op.Br.), p. 14. Thus, while recognizing the grand jury is a body acting as a constitutional safeguard, appellant tries to make hay of the fact that it was utilized where it was not constitutionally mandated.

15. See App. Op. Br., p. 14.

or variance which does not affect substantial rights shall be disregarded"). Therefore, if an error exists, it does not rise to the level of plain error and should be regarded as harmless beyond a reasonable doubt.

### D.

### APPELLANT'S CONSTITUTIONAL AND STATUTORY RIGHT TO PRIVACY

■ Last, we turn to Eric B.'s claim that his right to privacy was violated. This claim, as framed on appeal, also was not raised before the district court.[16] A plain error standard should be utilized for issues not presented to the court below. *United States v. Holland,* 880 F.2d 1091 (9th Cir.1989). Thus, Eric B. must demonstrate a clear error affecting substantial rights. *United States v. Dorri,* 15 F.3d 888 (9th Cir.1994).

This final argument presented by Eric B. asks us to find that the juvenile's statutory and constitutional privacy rights were violated, warranting dismissal of all charges against the juvenile.

■ Eric B. contends first that the government violated 18 U.S.C. § 5038(a),[17] by releasing confidential information concerning the proceedings. To support this claim, Eric B. points to *six* letters that were sent to the district court judge, as evidence that confidential information was released to the public.

Notably, of these six letters, two were sent by the victim's family, one was sent by the chief prosecutor in charge of the case against Eric B. in Navajo Family Court, and one was sent by the emergency medical technician who responded to the scene of the shooting. All letters sent by these individuals demonstrate very limited, non-specific knowledge about the precise proceedings. The two remaining letters do not exhibit any intimate knowledge of the particulars in the case whatsoever.[18]

Eric B. states that the authors of these letters refer to the juvenile by his full name and allude to facts in the case, and concludes, therefore, that the government released confidential information. This cannot be deemed evidence definitively establishing improper disclosure by the government. The only reasonable inference leads to a benign conclusion. Chilchinbeto is a very small Navajo community.[19] In large part, the content of the letters sent by non-family members describes Eric B.'s conduct prior to the day of the shooting. Thus, the familiarity with the identity of Eric B. which he necessarily attributes to government misconduct is at least as likely to be—and more logically and reasonably—credited to the size of the community. This is understandable, particularly in light of the shocking nature of this offense, and the fact that it appears several community members had experience with Eric B.'s

16. Apparently, counsel for Eric B. made a limited objection to these letters, seeking only for Eric B. to be allowed to see the content of the letters. The court permitted this, and counsel did not object to the use of the letters at the disposition hearing.

17. § 5038(a), in pertinent part, reads:
throughout and upon the completion of the juvenile delinquency proceeding, the records shall be safeguarded from disclosure to unauthorized persons. The records shall be released to the extent necessary to meet the following circumstances:

 .  .  .  .

3) inquires from law enforcement agencies where the request for information is related to the investigation of a crime or a position within that agency;

 .  .  .  .

6) such inquiries from any victim of such juvenile delinquency, or if the victim is deceased from the immediate family of such

victim, related to the final disposition of such juvenile by the Court in accordance of Section 5037.

18. While it certainly does not carry the day, the government notes that appellant himself submitted several letters from extended family members and others, in which the same inference of improper disclosure on the part of appellant's counsel may be made.

19. This point is convincingly demonstrated by the letter sent by Geoffrey Keahey, the paramedic who responded to the scene of the shooting. Mr. Keahey's son was one of the children at whom appellant pointed the gun prior to shooting the fatal shot. It is no wonder that Mr. Keahey knows the appellant's last name and some of the circumstances surrounding the shooting. His son was intimately involved in this tragic event.

troubling behavior before the day of the shooting.

In sum, select excerpts of six letters are being offered by Eric B. to argue that the government flagrantly violated Eric B.'s right to privacy, calling for the only appropriate redress: dismissal of this case. Woven into this argument is the unsupported assertion that these letters somehow improperly affected the district court's sentencing decision. Yet, as the government correctly points out, the district court still decided against incarceration and placed the juvenile on probation.

■ In addition to receiving letters from the public and from the relatives of both Eric B. and the victim, at the disposition hearing the district court allowed the victim's family and the juvenile's family to address the court. Eric B. asserts the court only erred by allowing the former, but does not mention the propriety of the latter.

The district court relied, in part, on *United States v. A.D.*, 28 F.3d 1353 (3rd Cir.1994), in permitting the presence of the victim's family at the disposition hearing. In *A.D.*, a newspaper sought access to juvenile proceedings. Avoiding a clash between the First Amendment and the juvenile's right to privacy under the Act, the court held that a district court may, on a case-by-case basis, balance the interests of the juvenile against the interests of the party seeking access to the proceeding. *Id.* at 1359.

The *A.D.* court opined that if Congress desired juvenile proceedings to be closed to everyone except for the litigants, witnesses and court personnel, it could have explicitly said so. But Congress did not. Thus, because the act did not expressly mandate closed hearings and sealed records in all circumstances, it is left to the district court to balance the respective interests when the need arises. This is because "[d]istrict judges are experienced at striking this kind of delicate balance . . . ."

Here, the district court allowed only the victim's parents and Eric B.'s family to attend the proceedings.[20] The district court permitted family members to attend the proceedings in order for the victim's parents to better understand and accept the outcome. While the victim's father did speak at the disposition hearing, it was only after the court stated it intended to place the juvenile on probation, which it ultimately did.

The Act does not expressly preclude the district court from using its discretion regarding the presence of family members at the disposition hearing. Close inspection of the Act does not lead to the conclusion that Congress intended closed proceedings, without exception. For example, § 5032 states that "court may be convened at any time and place within the district, in chambers or otherwise." This language implicitly confers discretion on the court to control public access to the proceedings. To interpret § 5032 differently would render superfluous the distinction between the words "in chambers" and "or otherwise."

Finally, Eric B. argues that his constitutional right to privacy was violated. More specifically, he claims his constitutional right of nondisclosure of personal matters was violated when information was released, as evidenced by the above letters, and by the presence of the victim's parents at the disposition hearing.[21]

Eric B. cites no case that recognizes a constitutional right to have free from disclosure all facts elicited in a juvenile proceeding. Trying to support this position, Eric B. asserts that "[t]he right of non-disclosure conferred on juveniles through § 5038 also gives rise to the constitutional right to the non disclosure [sic] of confidential, personal information." App. Op. Br., p. 24. This unique argument loses steam on even a cursory

---

**20.** The government adds that counsel for appellant, in making an objection to the presence of the victim's parents, stated, "I don't, however, object to the victim's family being present for the purposes of coming and addressing the Court, as long as they are asked to leave and the government can apprise them of what happens after that portion of the hearing, Your Honor."

**21.** It may be inferred that counsel for appellant concedes that this right of privacy argument is suspect, since appellant's reply brief dropped all reference to this issue.

review of the Act, which provides for numerous exceptions to nondisclosure and permits a victim's family to have access to information regarding the final disposition of the case. *See* § 5038(a)(6).

Even if we were to give credence to Eric B.'s argument—which we do not—Eric B. again fails to demonstrate, or even mention, any prejudice suffered from the acts of which he complains.

Accordingly, we affirm the ruling by the district court.[22]

LEAVY, Circuit Judge, concurring:

I concur in the result reached by the majority on all substantive issues, and agree that the judgment of the district court should be affirmed. I write separately, however, because I see no need to discuss "excludable time" or the defendant's implicit consent to exceeding the thirty-day statutory limit. As we are agreed that the trial was within the time allowed by the statute, discussion of excludable time and consent have nothing to do with the outcome and are, therefore, mere dicta.

Even if the issue of speedy trial depended on our consideration of implied consent, I see no basis for criticism of defense counsel. No one suggests that she made any false statements to the court or anyone else. When October 14 was set as the trial date, she had a pending appeal of the magistrate judge's denial of her motion for release from custody. If she had been successful on the appeal, the speedy trial issue would have gone away. The court asked, "Do you expect to go to trial within the thirty days' time?" She answered, "If he's in custody, yes, I would."

On the morning of trial counsel moved to dismiss for violation of the Speedy Trial Act. She argued that under *United States v. Andy,* 549 F.2d 1281 (9th Cir.1977), the act had been violated. The trial court questioned defense counsel's timing of the motion, with the admonition that "there is an expense in getting all these people here." In denying

the motion, the trial court did not find a waiver of the time limits.

Congress passed the speedy trial provision, the President signed it, the United States Attorney decided what charge to make, whom to charge, and when to take the accused into custody. An assistant United States attorney contended that a trial on October 14 was within the time limit. The district court set that date, and we have affirmed. We do not expect a twelve year old child to tell us how to obey the statute, nor should we expect an assistant federal defender to volunteer advice to the government or to the court on how to avoid a dismissal of the charge.

---

22. Eric B.'s counsel's attempt to have this Court punish the government without any showing of prejudice is unseemly conduct not addressed to the true issues to be presented on an appeal of this nature.