**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.

VIOLET BRUCE,
                    *Defendant-Appellant.*

No. 03-30171

D.C. No.
CR-02-00089-SEH

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
March 4, 2004—Seattle, Washington

Filed January 13, 2005

Before: Diarmuid F. O'Scannlain, Pamela Ann Rymer, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Rymer

**COUNSEL**

John Rhodes and Anthony R. Gallagher, Federal Public Defender's Office, Missoula, Montana, Michael Donahoe, Federal Defenders of Montana, Helena, Montana, for the defendant-appellant.

Marcia Hurd, William W. Mercer and Klaus P. Richter, United States Attorney's Office, Billings, Montana, for the plaintiff-appellee.

**OPINION**

BYBEE, Circuit Judge:

Violet Bruce appeals her conviction for simple assault on an Indian child less than 16 years of age on a reservation in violation of 18 U.S.C. §§ 1152 and 113(a)(5). In her sole claim of error, Bruce asserts that the case against her was brought under the wrong statute. The government charged

Bruce under § 1152, which covers offenses committed in Indian country, but excepts crimes committed by an Indian against another Indian. Bruce contends that she is an Indian, and the government should have charged her under 18 U.S.C. § 1153, which covers certain offenses committed by an Indian in Indian country. The district court denied her motion to dismiss on this ground. We conclude that Bruce presented sufficient evidence that, if believed, established her Indian status. We further hold that the court's error was not harmless. We therefore reverse.

## FACTS AND PROCEEDINGS

In March 2002, Bruce, a resident of the Fort Peck Indian Reservation in northeast Montana, choked her five-year-old son, Cylus, and in so doing, bruised his face and neck. On September 23, 2002, a grand jury indicted Bruce for assault on a child less than 16 years of age on an Indian reservation, in violation of 18 U.S.C. §§ 1152 and 113(a)(5). The indictment stated, "That on or about March 25, 2002, at or near Wolf Point, in the State and District of Montana, and within the exterior boundaries of the Fort Peck Indian Reservation, being Indian country, the defendant, VIOLET BRUCE, did assault another, an Indian person who had not attained the age of 16 years . . . , all in violation of 18 U.S.C. §§ 1152 and 113(a)(5)." The indictment, thus, alleged that the victim was an Indian person, but said nothing about Bruce's status.

Bruce admitted that she choked Cylus but, on her attorney's advice, she pled not guilty. During the district court proceedings, Bruce repeatedly argued that she was Indian. Before trial, she moved to dismiss the indictment on the ground that it should have been brought under 18 U.S.C. § 1153, which applies to certain crimes by Indians, rather than § 1152, which excepts crimes by Indians against Indians. The court denied the motion.

At trial, Bruce's only defense was her claim of Indian status. At the close of the government's case, Bruce again raised

the argument in a motion for judgment of acquittal under Fed. R. Crim. P. 29, which the district court also denied. At the close of all of the evidence, the court considered her Indian status defense at length. Bruce introduced evidence that she is one-eighth Chippewa; that her mother is an enrolled member of the Turtle Mountain Tribe of Oklahoma; that she was born on an Indian Reservation; that she currently lives on the Fort Peck Indian Reservation; that two of her children are enrolled members of an Indian tribe; that she has been treated by Poplar Indian Health Services and the Spotted Bull Treatment Center; that whenever she was arrested it "had to have been [by] a tribal person"; and that she has been arrested by tribal authorities "all her life." The district court concluded that, under § 1152, Bruce's Indian status was an affirmative defense on which Bruce had the burden of production and that she had not borne this burden. Accordingly, the court declined to submit the issue to the jury.

A jury convicted Bruce of violating § 1152 and the district court sentenced her to three years' probation. Following her conviction, Bruce unsuccessfully moved to arrest the judgment under Fed. R. Crim. P. 34 on the basis of her claimed Indian status. In support of her motion, Bruce introduced additional evidence showing that in 1991 she was treated as an Indian child by the Fort Peck Tribal Court, exercising jurisdiction pursuant to the Indian Child Welfare Act, 25 U.S.C. § 1901 (2004). After her motion was denied, Bruce took this appeal.

## STANDARD OF REVIEW

We review *de novo* the district court's determination of Indian status under 18 U.S.C. § 1152 because it is a mixed question of law and fact. *United States v. Eric B.,* 86 F.3d 869, 877 (9th Cir. 1996); *United States v. Keys,* 103 F.3d 758, 761 (9th Cir. 1996) (reviewing Indian status *de novo*). Mixed questions of law and fact are those in which "the historical facts are admitted or established, the rule of law is undisputed,

and the issue is whether the facts satisfy the statutory standard." *Pullman-Standard v. Swint,* 456 U.S. 273, 289 n.19 (1982).

## DISCUSSION

### A.   *Federal Criminal Jurisdiction in Indian Country*

The exercise of criminal jurisdiction over Indians and Indian country is a "complex patchwork of federal, state, and tribal law," which is better explained by history than by logic. *Duro v. Reina*, 495 U.S. 676, 680 n.1 (1990). The historical background of federal criminal jurisdiction in Indian country can be traced to colonial times, when Indian territory was entirely the province of the tribes and the tribes were understood to possess jurisdiction over all persons and subjects present on Indian lands. *See* WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW IN A NUTSHELL 133 (2004). This policy continued until shortly after the ratification of the Constitution, when Congress extended federal jurisdiction to non-Indians committing crimes against Indians in Indian territory. 1 Stat. 138 (1790); 1 Stat. 743 (1799); 2 Stat. 139 (1802). Congress further extended criminal jurisdiction in 1817 to cover crimes committed by Indians and non-Indians in Indian Country; notably, Congress excepted intra-Indian offenses, or crimes in which both the victim and perpetrator were Indian. 3 Stat. 383 (1817).

The 1817 Act served as the predecessor to 18 U.S.C. § 1152, which is sometimes called the Indian General Crimes Act ("IGCA"). Section 1152 makes federal enclave criminal law—a concrete body of law governing areas within the sole and exclusive jurisdiction of the United States—generally applicable to crimes committed in "Indian country." *See* 18 U.S.C. § 1151 (defining "Indian country"). Section 1152 provides in full:

> Except as otherwise expressly provided by law, the general laws of the United States as to the pun-

ishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

In its original form, the IGCA ensured that federal criminal laws reached non-Indians committing crimes in Indian country, while at the same time preserving the right of the tribes to punish their own. *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 201 (1978).

The IGCA excepts from federal criminal jurisdiction three categories of offenses that might otherwise be thought to be within the jurisdiction of the tribes: "offenses committed by one Indian against the person or property of another Indian," offenses committed by an Indian who has been punished by the tribe, and cases secured by treaty to the exclusive jurisdiction of a tribe. 18 U.S.C. § 1152. Although the "plain language" of § 1152 covers crimes in Indian country committed by non-Indians against non-Indians, *Mull v. United States*, 402 F.2d 571, 573 (9th Cir. 1968), the Supreme Court has held that states retain exclusive jurisdiction over general crimes committed by non-Indians against non-Indians in Indian country. *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 68 (1962); *New York ex rel. Ray v. Martin*, 326 U.S. 496 (1946); *Draper v. United States*, 164 U.S. 240 (1896); *United States v. McBratney*, 104 U.S. 621 (1881). Thus, under the IGCA, the criminal laws of the United States apply to offenses committed in Indian country by non-Indians against

Indians and by Indians against non-Indians; "[section] 1152 establishes federal jurisdiction over interracial crimes only." *United States v. Prentiss*, 256 F.3d 971, 974 (10th Cir. 2001) (per curiam) (en banc).

The exception in the IGCA preserves the right of tribal courts to try offenses committed in Indian country by Indians against Indians, while recognizing that Indian tribes generally do not have jurisdiction over non-Indians. *See Oliphant*, 435 U.S. at 195-206 & n.8; *see also* 25 U.S.C. § 1302(2) (recognizing "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over all Indians"). The Supreme Court has interpreted the exception as manifesting a broad congressional respect for tribal sovereignty in matters affecting only Indians. *See United States v. Quiver*, 241 U.S. 602 (1916) (broadly interpreting the intra-Indian offense exception to extend to adultery involving an Indian participant).

Following the Supreme Court's decision in *Ex Parte Crow Dog*, 109 U.S. 556 (1883), which held that neither federal nor tribal courts had jurisdiction to try an Indian for the murder of another Indian on a reservation, Congress revisited this policy. Congressional displeasure with the *Crow Dog* decision led to the passage of a second statute, 18 U.S.C. § 1153, designed to establish as federal crimes, fourteen named offenses committed by Indians in Indian country. *See United States v. Broncheau*, 597 F.2d 1260, 1265 (9th Cir. 1979), *cert. denied*, 444 U.S. 859 (1979). As relevant for our purposes, § 1153 provides:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely . . . an assault against an individual who has not attained the age of 16 years . . . shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a) (2004). Enacted in 1885, the Indian Major Crimes Act ("IMCA") guaranteed that Indians committing major crimes against other Indians would be treated with the same rigor as non-Indian offenders. *See Oliphant*, 435 U.S. at 203 & n.4. The IMCA, the Court has recognized, is a " 'carefully limited intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land.' " *United States v. Antelope*, 430 U.S. 641, 642-43 n.1 (1977) (quoting *Keeble v. United States*, 412 U.S. 200, 209 (1973)).[1] Assault against an individual who has not attained the age of 16 years is one of the enumerated crimes that the IMCA covers.

We have recognized that the "limited intrusion" on Indian sovereignty in the IMCA is itself confined to federal enclave law. In *United States v. Begay*, 42 F.3d 486, 498 (9th Cir. 1994), we rejected the claim "that Indians may not be charged for any criminal conduct beyond those crimes enumerated in [the Indian Major Crimes Act]." We concluded that the IMCA only concerns "the application of federal enclave law to Indians and has no bearing on federal laws of nationwide applicability that make actions criminal wherever committed." *Id.* (citing *United States v. Top Sky*, 547 F.2d 483, 484 (9th Cir. 1976)). Thus, we held that federal criminal laws of general, nationwide applicability—such as the federal conspiracy statute, 18 U.S.C. § 371—apply to Indians unless a treaty specifically exempts them. *Id.* at 499 (citing *United States v. Burns*, 529 F.2d 114, 117 (9th Cir. 1975)).

---

[1]The scope of the statute was expanded significantly by the Supreme Court's decision in *Keeble*, which held that an Indian charged pursuant to the IMCA was entitled to request and receive instructions as to lesser and included offenses if the evidence would permit the jury rationally to find him guilty of the lesser offense and acquit him of the greater. *Id.* at 208-09; *see also United States v. John*, 587 F.2d 683 (5th Cir. 1979) (upholding conviction on lesser and included offense); *accord Felicia v. United States,* 495 F.2d 353 (8th Cir. 1974).

Despite these intrusions, tribal courts retain jurisdiction to punish certain crimes occurring in Indian country. However, under the Indian Civil Rights Act, 25 U.S.C. § 1301 *et al.* ("ICRA"), tribal courts may not impose punishment greater than a year's imprisonment or a $5,000 fine, or both. *Id.* § 1302(7). Tribal courts may generally punish offenses committed by members of the tribe and may prosecute misdemeanors against Indians who are not members of that tribe. 25 U.S.C. § 1301(2); *see also United States v. Lara*, 124 S.Ct. 1628, 1636, 1639 (2004) (rejecting a challenge to the ICRA Amendment and upholding the authority of Congress to "permit tribes, as an exercise of their inherent tribal authority, to prosecute nonmember Indians," but declining to reach the question of "whether the Constitution's Due Process or Equal Protection Clauses prohibit tribes from prosecuting a nonmember citizen of the United States."). Because the tribe's jurisdiction stems from its inherent authority, rather than federal delegation, successive prosecution by a tribe and the federal government does not run afoul of the Double Jeopardy Clause, as the two are dual sovereigns. *Id.* at 1639. Nonetheless, Congress has statutorily forbidden a successive prosecution in federal court brought pursuant to § 1152 after the tribe has imposed punishment for the offense. 18 U.S.C. § 1152.

In addition to federal and tribal jurisdiction, there are statutes in which Congress has "unambiguously confer[red] jurisdiction on the State over major offenses committed by or against Indians on Indian reservations." *Negonsott v. Samuels*, 507 U.S. 99, 110 (1993) (construing The Kansas Act, 18 U.S.C. § 3243). Aside from statutory grants, the effect of the Supreme Court's decision in *McBratney,* 104 U.S. at 624, is to recognize state jurisdiction for crimes committed by non-Indians against non-Indians on Indian territory.

We can summarize these rules concerning criminal jurisdiction in Indian country as follows:

1. Crimes in which both the perpetrator and victim are Indian are subject to (a) federal jurisdiction under

§ 1153 if the crime charged is one of the fourteen enumerated crimes (and conviction may extend to lesser included offenses), or if the federal statute is one of general applicability; (b) state jurisdiction where authorized by Congress; and (c) tribal jurisdiction, perhaps running concurrent with either federal or state jurisdiction, although punishment is limited to no more than one year and $5,000.

2.    Crimes in which the perpetrator, but not the victim, is Indian are subject to (a) federal jurisdiction under § 1152 (except where the tribe has already imposed punishment or the tribe has exclusive jurisdiction through treaty), or § 1153 (if the crime is one of the fourteen enumerated crimes, with conviction perhaps extending to lesser included offenses), and pursuant to federal criminal laws of general applicability; (b) state jurisdiction where authorized by Congress; and (c) tribal jurisdiction, perhaps running concurrently with either federal or state jurisdiction, although punishment is limited to no more than one year and $5,000.[2]

3.    Crimes in which the victim, but not the perpetrator, is Indian are subject to (a) federal jurisdiction under § 1152, as well as pursuant to federal criminal laws of general applicability, and (b) state jurisdiction where authorized by Congress.

4.    Crimes in which both the perpetrator and victim

---

[2]Offenses committed by Indians against multiple victims, including both Indians and others, would fall subject to competing, and perhaps concurrent, claims of federal, state and tribal jurisdiction, although presumably a federal court could not impose punishment for an offense covered by § 1152 after a tribal court had done so.

are non-Indian are subject to state jurisdiction or federal criminal laws of general applicability.[3]

*See United States v. Johnson*, 637 F.2d 1224, 1231 n.11 (9th Cir. 1980); JULIE WREND & CLAY SMITH, AMERICAN INDIAN LAW DESKBOOK 99-100 (1998).

We note that the complex scheme established by Congress creates obvious gaps in federal jurisdiction to punish crimes in Indian country. For example, a non-Indian may be charged under § 1152 when the victim is an Indian; if his victim is a non-Indian, he generally must be charged under state law. An Indian may be charged with a host of federal crimes under § 1152 if his victim is a non-Indian, but generally only with major crimes under § 1153 if his victim is an Indian. *See Antelope*, 430 U.S. at 646-47 (rejecting an Equal Protection challenge to § 1153).

The one point that emerges with clarity from this otherwise bewildering maze of rules is that the question of who is an Indian bears significant legal consequences. Importantly, from a defendant's perspective, unless state jurisdiction is specifically authorized by Congress, or he is charged pursuant to a generally applicable federal criminal statute, an Indian person charged with committing a crime against another Indian person that is not listed in § 1153 is subject only to the jurisdiction of the tribe; the offender may only be punished for up to one year or fined $5,000, or both. 25 U.S.C. § 1302(7). Once an Indian person is punished by a tribe for an offense covered by § 1152, federal courts may no longer impose any punishment for that offense. Thus, Indian status carries certain benefits in the context of federal criminal adjudications.

Indian status also bears significance independent of crimi-

---

[3]Offenses committed by non-Indians against multiple victims, including both Indians and others, would fall subject to competing, and perhaps concurrent, claims of federal and state court jurisdiction.

nal jurisdiction. The host of federal statutes and service programs designed to benefit Indians are rife with status-based classifications used to designate the special position of a formerly sovereign people. *See Antelope,* 430 U.S. at 646; FELIX COHEN, HANDBOOK OF FEDERAL INDIAN LAW 19 (1982 ed.). These include, to name a few, the Indian Civil Rights Act, 25 U.S.C. § 1301; the Indian Health Care Improvement Act, *id.* § 1601; the Indian Education Act, *id.* § 1001; the Indian Alcohol Substance Abuse Act, *id*. § 2403(3); and the Indian Child Welfare Act, *id.* § 1901. *See Morton v. Mancari*, 417 U.S. 535, 552 (1974) ("Literally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians living on or near reservations."). Accordingly, some commentators have even gone so far as to characterize Indian status as a "property interest." *See* GAIL K. SHEFFIELD, THE ARBITRARY INDIAN: THE INDIAN ARTS AND CRAFTS ACT OF 1990, at 138 (1997). Although the requirements may vary depending upon the purpose for which Indian status is claimed, courts cannot be ignorant of the collateral consequences their rulings might have in future proceedings. It is against the backdrop of these formal and functional considerations that we must discern the precise relationship between §§ 1152 and 1153—the two bifurcated statutory remnants of a complicated jurisdictional history.

## B.   Indian Status as a Defense to § 1152

Bruce contends that, because she and her victim are both Indians, her indictment should have been brought pursuant to § 1153, rather than § 1152. In order to resolve this contention, we must first determine what effect one's claimed Indian status has in a prosecution brought pursuant to § 1152.

[1] In *United States v. Hester*, 719 F.2d 1041 (9th Cir. 1983), we held that "the Government need not allege the non-Indian status of the defendant in an indictment under section 1152, nor does it have the burden of going forward on that

issue." *Id.* at 1043. Rather, "[o]nce the defendant properly raises the issue of his Indian status, then the ultimate burden of proof remains . . . upon the Government." *Id.* (citing *United States v. Guess*, 629 F.2d 573, 577 n.4 (9th Cir. 1980)). Section 1152 thus requires that Bruce not only raise her Indian status but also that she carry the burden of production for that issue; Indian status, after *Hester*, is in the nature of an affirmative defense. To satisfy her burden, Bruce must come forward with enough evidence of her Indian status to permit a fact-finder to decide the issue in her favor. No court has yet specified the quantum of evidence that must be offered in order to satisfy this production burden. Nonetheless, once she meets this burden, the government retains the ultimate burden of persuasion—or "the obligation to persuade the trier of fact of the truth of [the] proposition," *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 268 (1994)—that the exception she claims is inapplicable. *See Martin v. Ohio*, 480 U.S. 228, 237 (1987) (Powell, J., dissenting) (noting that "when an affirmative defense *does* negate an element of the crime . . . the state [must] prove the nonexistence of the defense beyond a reasonable doubt") (emphasis in original) (citing *In re Winship*, 397 U.S. 358 (1970)); *Patterson v. New York,* 432 U.S. 197, 207-09 & nn. 10-11 (1977) (noting that "the trend over the years appears to have been to require the prosecution to disprove affirmative defenses beyond a reasonable doubt"); *Guess*, 629 F.2d at 577 n.4 (explaining the general rule that "once a criminal defendant satisfies his burden of production with respect to an affirmative defense, the prosecution must prove the inapplicability of this defense beyond a reasonable doubt").

Bruce argues that the district court erred by refusing to submit the issue of her Indian status to the jury because she presented enough evidence to meet her burden of production. The government responds that Bruce did not meet her burden, or alternately, that, assuming Bruce is Indian, the prosecution

under § 1152 was harmless because her conduct was equally illegal under § 1153.

*C.   Determining Who Is an "Indian"*

**[2]** The term "Indian" is not statutorily defined, but courts have "judicially explicated" its meaning. *Broncheau*, 597 F.2d at 1263. The generally accepted test for Indian status considers " '(1) the degree of Indian blood; and (2) tribal or government recognition as an Indian.' " *United States v. Keys*, 103 F.3d 758, 761 (9th Cir. 1996) (quoting *Broncheau*, 597 F.2d at 1263); *see also United States v. Rogers,* 45 U.S. (4 How.) 567, 573 (1846) (interpreting the meaning of "Indian" under the Trade and Intercourse Act of 1834, the precursor of the Major Crimes Act, not to apply to a white man who had been adopted into the Cherokee tribe).[4] A person claiming Indian status must satisfy both prongs. The first prong requires ancestry living in America before the Europeans arrived, but this fact is obviously rarely provable as such. *See* CANBY, *supra*, at 9. Because the general requirement is only of "some" blood, evidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong. *Id.*; *see also Vezina v. United States*, 245 F. 411 (8th Cir. 1917) (women 1/4 to 3/8 Chippewa Indian held to be Indian); *Sully v. United States*, 195 F. 113 (8th Cir. 1912) (1/8 Indian blood held sufficient to be Indian); *St. Cloud v. United States*, 702 F. Supp. 1456, 1460 (D.S.D. 1988) (15/32 of Yankton Sioux blood sufficient to satisfy the first requirement of having a degree of Indian blood); *Goforth v. State*, 644 P.2d 114, 116 (Okla. Crim. App. 1982) (requirement of Indian blood satisfied by testimony that

---

[4]The Indian Civil Rights Act does not define "Indian" but begs the question by defining an Indian as "any person who would be subject to the jurisdiction of the United States as an Indian under section 1153, title 18, [United States Code] if that person were to commit an offense listed in that section in Indian country to which that section applies." 25 U.S.C. § 1301(4) (2004).

person was slightly less than one-quarter Cherokee Indian); *Makah Indian Tribe v. Clallam County*, 440 P.2d 442 (Wash. 1968) (1/4 Makah blood sufficient to satisfy Indian blood requirement).

**[3]** The second prong of the test—tribal or federal government recognition as an Indian—"probes whether the Native American has a sufficient non-racial link to a formerly sovereign people." *St. Cloud*, 702 F. Supp. at 1461. When analyzing this prong, courts have considered, in declining order of importance, evidence of the following: "1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life." *United States v. Lawrence*, 51 F.3d 150, 152 (8th Cir. 1995) (citing *St. Cloud*, 702 F. Supp. at 1461).

Bruce presented evidence to establish both her Indian blood and recognition. With respect to Indian blood, she offered evidence that she is one-eighth Chippewa Indian and introduced a certificate of Indian blood confirming this fact. She also offered evidence that her mother is an enrolled member of the Turtle Mountain Tribe of Oklahoma, and that two of Bruce's children are enrolled members of an Indian tribe.[5] With respect to recognition, she presented evidence that she was born on an Indian reservation and currently lives on one; that she participates in Indian religious ceremonies; that she has, on several occasions, been treated at Indian hospitals; and that she was "arrested tribal" all her life.

The district court, applying the two-part test for determining Indian status, concluded that Bruce had provided evidence to establish the first prong, her Indian blood. Her status, therefore, turned on whether a tribe or the federal government had

---

[5]The presentence report, perhaps accepting her vouching uncritically, listed her race as "American Indian."

recognized her as an Indian. The district court cited the fact that she was not enrolled in a tribe and failed to present evidence that the federal government had recognized her to be an Indian. On the basis of this evidence, it found that Bruce had not met her burden on this prong and concluded that she had not satisfied her burden of production as to the affirmative defense.

**[4]** We disagree. Tribal enrollment is "the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative." *Broncheau*, 597 F.2d at 1263; *accord Antelope,* 430 U.S. at 646 n.7 ("[E]nrollment in an official tribe has not been held to be an absolute requirement for federal jurisdiction . . . .") (citations omitted); *Keys*, 103 F.3d at 761 ("While tribal enrollment is one means of establishing status as an 'Indian' under 18 U.S.C. § 1152, it is not the sole means of proving such status.") (citation omitted); *Ex parte Pero*, 99 F.2d 28, 31 (7th Cir. 1938) ("The lack of enrollment . . . is not determinative of status. . . . [T]he refusal of the Department of Interior to enroll a certain Indian as a member of a certain tribe is not necessarily an administrative determination that the person is not an Indian."); *St. Cloud*, 702 F. Supp. at 1461 ("[A] person may still be an Indian though not enrolled with a recognized tribe."). Nor have we required evidence of federal recognition. Rather, we have emphasized that there must be some evidence of government or *tribal* recognition. *See Keys*, 103 F.3d at 761 (concluding that where child was shown to have Indian blood and was treated by tribe as a member of the tribe, district court properly found that she was an Indian); *accord Ex parte Pero*, 99 F.2d at 31; *Lewis v. State*, 55 P.3d 875, 878 (Idaho Ct. App. 2001). This stems from the recognition that one of an Indian tribe's most basic powers is the authority to determine questions of its own membership. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978); *United States v. Wheeler*, 435 U.S. 313, 322 n.18 (1978); *Cherokee Intermarriage Cases*, 203 U.S. 76 (1906); *Roff v. Burney*, 168 U.S. 218 (1897).

Motivated in part by equal protection concerns, the dissent proposes a new test for determining Indian status; one that would conflate our two-pronged *Rogers* inquiry and multifaceted "recognition" guidelines into a single question: whether the individual is enrolled or eligible for enrollment in a federally recognized tribe. From a purely conceptual standpoint, we agree that eligibility for enrollment provides a simpler framework within which we might judge Indian status as a political affiliation with a formerly sovereign people. Nonetheless, it is not the test that we have adopted, and until either Congress acts or the Supreme Court or an en banc panel of our court revises the "recognition" prong of the *Rogers* test, we are bound by our prior jurisprudence. In particular, we are bound by the body of case law which holds that enrollment, and, indeed, even eligibility therefor, is not dispositive of Indian status. *Broncheau*, 597 F.2d at 1263; *Keys*, 103 F.3d at 761. In sum, we are not permitted to hold that these cases do not mean what they say.[6]

---

[6]We note, in addition, that unenrolled Indians are eligible for a wide range of federal benefits directed to persons recognized by the Secretary of Interior as Indians *without statutory reference to enrollment*. For example, The Native American Programs Act of 1974, creating the Administration for Native Americans, operates under regulations with a very broad definition of Indian: "any individual who claims to be an Indian and who is regarded as such by the Indian community in which he or she lives or by the Indian community of which he or she claims to be a part." 45 C.F.R. § 1336.1 (1989); *see also* Indian Health Care Improvement Act of 1976, 25 U.S.C. § 1603(c) (member of a tribe including those terminated and those recognized in the future; descendent in first or second degree of a member; and anyone "determined to be an Indian under regulations promulgated by the Secretary"); Indian Arts and Crafts Act of 1990, 18 U.S.C. § 1159(c)(1) (1994), 25 U.S.C. § 305e(d)(2) (1994) (defining "Indian" as "any individual who is a member of an Indian tribe; *or* for the purposes of this section is certified as an Indian artisan by an Indian tribe") (emphasis added); ROBERT N. CLINTON, ET AL., AMERICAN INDIAN LAW: CASES AND MATERIALS 84 (3d ed. 1991) ("Beginning with the Non-Intercourse Acts of the late 1700s and through enactment of the 1934 Indian Reorganization Act, federal law has treated 'Indians' as a class without regard to proof of tribal enrollment").

Consequently, we find *United States v. Keys*, 103 F.3d 758, particularly instructive. Keys, a non-Indian, was charged under § 1152 with assault of his daughter, who possessed one-fourth Indian blood. Keys argued that the government had failed to prove that his daughter, who was not enrolled, was an Indian (presumably on the theory that after *McBratney*, 104 U.S. at 624, assault committed by a non-Indian against a non-Indian victim could be charged under state law, but not under § 1152). The magistrate found that the tribal court had exercised jurisdiction over Keys's daughter, and that she had been provided medical services by an Indian hospital. The magistrate concluded "beyond a reasonable doubt" that, under such circumstances, she was a "*de facto* member" of the tribe. *Id.* at 760. Without considering whether she was eligible for enrollment, we concluded that her Indian status was "amply demonstrated." *Id.* at 761.[7]

[5] Because of the procedural posture of the case with which we are presented, we are not required to decide whether Bruce conclusively established that she was an Indian. Rather, we must merely determine whether she brought forward enough evidence of tribal recognition to permit her defense to be heard by the jury. We conclude that she did.

[6] Bruce produced evidence that she had participated in sacred tribal rituals, including at least one sweat lodge ritual;

---

[7]*See also United States v. Dodge*, 538 F.2d 770, 787 (8th Cir. 1976) (concluding that defendant, Manuel M. Alvarado, was an Indian for purposes of § 1153, based merely on evidence that he possessed one-fourth Yurok Indian blood and, at one time, he filed an application to be recognized as a member of the Yurok Tribe on the California State Judgment Rolls; the court stated: Alvarado possessed "Indian blood and [ ] held [himself] out to be [an] Indian[ ]"); *St. Cloud*, 702 F. Supp. at 1460 (concluding that because the defendant resided on a reservation, benefitted from tribal programs, and was socially recognized as an Indian, he met the *Rogers* test for Indian status, notwithstanding the fact that he was no longer enrolled or eligible for enrollment in any federally recognized tribe).

that she was born on an Indian Reservation and continues to reside on one; that two of her children are enrolled members of an Indian tribe; and that she has been treated by Poplar Indian Health Services and the Spotted Bull Treatment Center. More significantly, her mother testified that whenever she was arrested it "had to have been [by] a tribal person" and that she has been arrested by tribal authorities "all her life." The precise testimony was as follows:

> Q.   When Violet was young, did she have issues or problems with the tribal authorities?
>
> A.   Not really. But *she was arrested tribal all her life.*
>
> Q.   Well, that's what I want to talk about. What does that mean that she was "arrested tribal"?
>
> A.   She got out of hand and someone had to come and get her, arrest her. *And it had to have been a tribal person.*
>
> Q.   And that would be drinking behavior and such?
>
> A.   Yeah. Fighting with her sister.
>
> Q.   Now, the tribal authorities would step in and take charge of the situation?
>
> A.   Yes.
>
> Q.   And did that involve dealing with the tribal authorities?
>
> A.   Yes.
>
> Q.   And *was Violet treated as an Indian person during those times*?

A.  *Yes.*

Q.  By the tribe?

A.  Yes.[8]

This testimony is significant because, as we have discussed, the tribe has no jurisdiction to punish anyone but an Indian. 25 U.S.C. § 1302(7); *Oliphant*, 435 U.S. at 191.

[7] In sum, Bruce brought forward testimony to establish that she was "arrested tribal" her entire life and that whenever she had a brush with the law it *had* to be with tribal authorities. Although not introduced as artfully by her counsel as it could have been, Bruce has put the question of tribal criminal jurisdiction on the table, and, in so doing, raised strong evidence of tribal recognition. The assumption and exercise of a tribe's criminal jurisdiction, while not conclusive evidence of Indian status, significantly bolsters the argument that Bruce met her burden of producing sufficient evidence upon which a jury might rationally conclude that she was an Indian.

We caution that Bruce was only required to meet a production burden. When combined with the testimony as to her one-eighth Chippewa blood line, the cumulative effect of the

---

[8]While we decline to rest our decision on information contained in the presentence investigation report, we note that the report corroborates her mother's testimony by listing two adult convictions in the Fort Peck Tribal Court for disorderly conduct. Additionally, a reply brief filed in support of her Rule 34 Motion to Arrest the Judgment charged that the government "failed [its obligations under *Brady v. Maryland*] to disclose during the discovery process that the defendant had been adjudicated in the Fort Peck Tribal Court as an Indian." 373 U.S. 83 (1963). Indeed, the record reflects that the government's case agent and BIA investigator was the Tribal Court judge who adjudicated Bruce as an Indian. This very same investigator sat with counsel for the government during the entire trial, quietly watching Bruce attempt to bring forward evidence of her tribal recognition, without disclosing that the defendant had been twice treated as an Indian in an Indian Tribal Court.

additional evidence of tribal recognition does at least that. To decline to find sufficient evidence of Indian status on these facts is to shift the burden to the defense. Bruce's burden is one of mere production.

**[8]** Accordingly, we hold that Bruce brought forward sufficient evidence that, if believed, would permit a jury rationally to conclude that Bruce was Indian.[9]

*D.   Harmless Error*

**[9]** Having determined that the court erred in declining to submit the issue of Bruce's Indian status to the jury, we must now determine whether that error was harmless. *See* FED. R. CRIM. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). The government argues that it makes no difference whether a jury could have concluded that Bruce was Indian because that would only mean that her conduct violated § 1153, rather than § 1152. Effectively, the government argues that because her victim was an Indian, her crime must be chargeable under either § 1152 or § 1153, and Bruce's Indian status is therefore irrelevant. Although the government's argument finds some support in the cases examining this issue, we find these cases distinguishable and the argument unpersuasive.

In *Henry v. United States,* 432 F.2d 114 (9th Cir. 1970), *modified,* 434 F.2d 1283 (9th Cir. 1971), we concluded that when an indictment charged a violation of § 1152 but the government actually prosecuted the case under § 1153, the error was harmless. In *Henry,* the indictment listed § 1152 but

---

[9]Bruce also presented evidence in a post-trial motion for arrest of judgment brought pursuant to FED. R. CRIM. P. 34 that she was adjudicated as an Indian child by a tribal court exercising jurisdiction pursuant to the Indian Child Welfare Act, 25 U.S.C. § 1901 (2004). Because we conclude that the evidence Bruce introduced at trial was sufficient to meet her burden of production, we need not decide whether the additional evidence that Bruce presented in her post-trial motions merits consideration.

alleged that the defendant was Indian. *See Henry*, 432 F.2d at 117-18. The court instructed the jury that the defendant's Indian status was an element of the offense, and the jury found that the government had proven that the defendant was Indian beyond a reasonable doubt. *See id.* Although the indictment read § 1152, the defendant was in all other respects prosecuted under § 1153, and not § 1152. Thus, *Henry* dealt with little more than a scrivener's error.

In *United States v. Heath*, 509 F.2d 16 (9th Cir. 1974), we concluded that an indictment under § 1153, alleging that both the victim and the defendant were Indian, was sufficient to support a conviction under § 1152. The facts in *Heath* were quite unusual. Heath had initially stipulated that she was an Indian (which would have subjected her to § 1153); however, on appeal she argued that, by act of Congress, the Klamath tribe was dissolved, and she was no longer entitled to claim Indian status at the time of her offense. *See* 25 U.S.C. § 564q (2004). We agreed that she was no longer an Indian, but held that the error in the indictment was harmless beyond a reasonable doubt. *Id.* at 20. In reaching this conclusion, considerable emphasis was placed on Heath's pre-trial stipulation that she was an Indian, *id.* at 20 n.4, as well as the indictment's proper reference to the victim's Indian status, which, given the termination of Heath's Indian status, was a pre-requisite for her conviction under § 1152. *Id.* at 20. Moreover, as *Heath* clearly implies, a denial of Indian status operates as a jurisdictional element under § 1153, which is generally resolved by a judge, rather than an affirmative defense, which must be submitted to the jury after the defendant carries his production burden.[10] Importantly, however, in neither *Henry* nor *Heath* was the question of Indian status contested at trial.

---

[10]In addition, we note that harmless error analysis may find greater justification when the prosecution has already met the more difficult task of proving guilt beyond a reasonable doubt under § 1153, which requires proof of Indian status, rather than choosing to indict under § 1152, which effectively shifts the burden and cost of producing evidence of Indian status to the defendant.

While other circuits have reached the same conclusion under similar circumstances, only one case involved an objection timely filed. In *United States v. White Horse*, 316 F.3d 769 (8th Cir. 2003), the Eighth Circuit held that a charge brought under § 1152 rather than § 1153 was not plainly erroneous because "[b]etween them, the statutes apply to all defendants whatever their race or ethnicity." *Id.* at 772-73; *see also id.* at 772 (noting that objection was not raised at trial). The Tenth Circuit in *Prentiss*, 256 F.3d 971, concluded that, although the Indian/non-Indian status of the victim and defendant are essential elements of § 1152 crimes which must be alleged in the indictment, the failure of the indictment to allege those elements was harmless error. *See also id.* at 983 (reasoning that the indictment should be construed liberally because the defendant's challenge was belated). In *United States v. John,* 587 F.2d 683, 688 (5th Cir. 1979), the Fifth Circuit, without commenting on the timeliness of the motion, concluded that an indictment's erroneous reliance on § 1153, rather than § 1152, was harmless where the applicable federal enclave law was also referenced such that it was "clear that the indictment asserted jurisdiction under § 1152 as an unstated premise."

Close examination demonstrates that none of these cases involves a timely challenge to a prosecution both instituted and actually conducted pursuant to the wrong statute. Yet, their reasoning is alluring because Bruce—who does not dispute that she committed the underlying act of choking her child—is guilty under either § 1152 or § 1153; either she is an Indian or she is not. *See White Horse,* 316 F.3d at 773. Given all of the evidence offered at trial, the conclusion that the district court reached the "correct result" despite its error seems almost inescapable. *See, e.g., United States v. Rubenstein,* 151 F.2d 915, 920 (2d Cir. 1945) (Frank, J., dissenting) (famously characterizing this approach to harmless error review as follows: "If we, sitting on a reviewing court, believe, from merely reading the record, that a defendant is guilty, then we . . . hold that an error . . . even if it may seriously have preju-

diced the jury against the defendant, is to be regarded as 'harmless.' ").

Nonetheless, this logic belies harmless error scrutiny. In reviewing nonconstitutional error on direct appeal under Rule 52(a), we adhere to the analysis first provided by the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750 (1946); *see also Brecht v. Abramson,* 507 U.S. 619, 637-38 (1993) (reaffirming the *Kotteakos* standard); *United States v. Brooke*, 4 F.3d 1480, 1488 (9th Cir. 1993) (stating that the standard for nonconstitutional error on direct review is governed by *Kotteakos*). In rejecting the premise underlying the "correct result" approach—namely, that a defendant has not been harmed by error if he should have been convicted in any event—*Kotteakos* reaffirmed a touchstone principle of appellate review: "[I]t is not the appellate court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. . . . Those judgments are exclusively for the jury." *Kotteakos,* 328 U.S. at 763 (citations omitted). Instead, *Kotteakos* offered the following standard:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

*Id*. at 764-65. The Court emphasized that whether "conviction would, or might probably, have resulted in properly conducted trial is not the criterion"; rather, we are merely to inquire whether "the error had substantial and injurious effect or influence *in determining the jury's verdict*." *Id.* at 776 (emphasis added).

**[10]** Using this framework, it is clear that our answer to the question of what would have happened without the error should not be based on our own satisfaction with the verdict, or even whether the evidence was sufficient for the jury to have reached the same verdict absent the error. The issue, rather, is what the jury actually would have done without the error. *See* WAYNE R. LaFAVE, JEROLD H. ISRAEL & NANCY J. KING, CRIMINAL PROCEDURE § 27.6(b) (2d ed. 1999). It is against this backdrop that we judge the harm caused to Bruce by the trial court's erroneous decision to prevent Bruce from reaching the jury on the question of her Indian status.

**[11]** We note that Congress has set forth, in §§ 1152 and 1153, two different mechanisms for asserting federal criminal jurisdiction. We have previously concluded that the defendant's Indian status is an essential element of a § 1153 offense which the government must allege in the indictment and prove beyond a reasonable doubt. *See United States v. James*, 980 F.2d 1314, 1317-19 (9th Cir. 1992) (concluding that where the defendant challenges the indictment before trial, the failure to allege Indian status is fatal to an indictment under § 1153); *Broncheau*, 597 F.2d at 1262 (implying that the defendant's Indian status is one of the "necessary elements" to be proven by the government in a § 1153 prosecution). Our conclusion that Bruce met her burden of production under § 1152 implies a finding that the jury could rationally acquit on the basis that the government failed to disprove her claimed Indian status. This does not equate to a finding that the government has *proven beyond a reasonable doubt* that Bruce *is* Indian, as required by § 1153. By prosecuting Bruce under § 1152, rather than § 1153, the government did not have to prove that Bruce was an Indian. In so doing, the government released itself of its obligation to prove an element of the offense beyond a reasonable doubt. The trial court's error was, thus, not anymore harmless than a failure to prove that the victim was indeed a child under the age of 16. Absent proof of Bruce's Indian status, there is no federal crime under § 1153.

Moreover, were we to find harmless error in this case—where the defendant has objected from the outset that she could not be charged under § 1152—we would have merged the two statutes into one. We would be inviting the government to charge under either statute, calculating that one of the provisions is likely to apply. This is not without consequences. Because § 1152 requires proof of fewer elements, the government would always have an incentive to indict under that section, thereby shifting the costs of producing evidence of Indian status to the defendant.

**[12]** Furthermore, as we have discussed, Bruce's status as an Indian *vel non* has consequences for any future prosecutions, and may also have collateral consequences in future non-criminal hearings where Indian status is at issue. To offer a single example, prior tribal punishment, as noted previously, is an affirmative defense to a prosecution instituted pursuant to § 1152. *See* 18 U.S.C. § 1152 (stating that "[t]his section shall not extend to . . . any Indian committing any offense in the Indian country who has been punished by the local law of the tribe . . ."). Were we to find harmless error in this case, it is not clear on what basis this affirmative defense could *ever* be raised in a prosecution brought against an Indian person under § 1152, so long as the crime could have been charged under § 1153. In sum, we simply cannot conclude, based upon the record, that the district court's error did not have a prejudicial effect on the outcome of the proceeding. *See Kotteakos,* 328 U.S. at 776.

We note, however, that this statutory framework creates an obvious and troubling conundrum. It is entirely probable that the government may be simultaneously unable either to prove or disprove a claim of Indian status, effectively foreclosing conviction under either statute. This is especially likely given that the burden of proof required for a defendant to place Indian status at issue in a § 1152 case may be as low as a preponderance, whereas the burden of proof required for the government to both disprove Indian status under § 1152 and to

prove Indian status under § 1153 is proof beyond a reasonable doubt. We are also aware of the additional expenditure of government resources required to reindict Bruce under a different provision and to retry her with the same evidence, but we decline to challenge the government's charging decision. *See Prentiss*, 256 F.3d at 986 n.14. Judicial correction of indictments that erroneously misrepresent a defendant's Indian status presents the possibility of future adverse collateral consequences outside the criminal context, and improperly shifts the burden of proof otherwise applicable to the parties within the criminal arena.

In addition, where indictment is required, judicial correction of this sort serves to usurp the uniquely protective role of the grand jury.[11] The Fifth Amendment vests the grand jury with responsibility for determining "whether there is probable cause to believe a crime has been committed and [for] . . . protect[ing] . . . citizens against unfounded criminal prosecutions." *United States v. Calandra*, 414 U.S. 338, 343 (1974). The grand jury is part of the prosecutorial process, *Butz v. Economou*, 438 U.S. 478, 510 (1978), and we may not direct its activities. *See United States v. Dionisio*, 410 U.S. 1, 17

---

[11]While the Fifth Amendment requires presentment or indictment by a grand jury in felony cases, assault on a child under the age of sixteen, the crime for which Bruce is charged, is a Class A misdemeanor punishable by one year's imprisonment and/or a $100,000 fine, and, thus, does not implicate this concern. We note, however, that of the remaining 13 crimes enumerated in § 1153, at least 10 require indictment by a grand jury unless waiver is obtained. Where indictment is required, the concern for avoiding judicial usurpation by retroactively modifying indictments to conform to the evidence established at trial is directly implicated.

In the present case, although Bruce did not have to be indicted by a grand jury, the government nonetheless opted to proceed by grand jury indictment. While the prosecution's choice to indict—because it was merely optional—does not trigger our concern for safeguarding the protective role of the grand jury, it does demonstrate that the error in the indictment was easily correctable. Once her Indian status was established, Bruce could have been recharged by Bill of Information, without undue burden on the prosecution.

(1973). Accordingly, we may not presume to correct the decisions of the grand jury by altering the sections charged under the United States Code, except through our judgments, any more than we can, except through our judgments, correct the prosecutorial decisions of the executive. *See United States v. Williams*, 504 U.S. 36, 47-50 (1992); *United States v. Nixon*, 418 U.S. 683, 693 (1974); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1868).

While we are not ignorant of the troublesome nature of our judgment, we remain bound by the language and structure of these two statutes. The federal crimes at issue here "are solely creatures of statute," *Staples v. United States,* 511 U.S. 600, 604 (1994). Subject to constitutional limitations not implicated here, Congress—not a federal appellate court—is authorized to define the elements of a federal criminal offense. *Whalen v. United States*, 445 U.S. 684, 689 & n.3 (1980). It is likewise up to Congress to correct any awkwardness in the interrelation of the acts it promulgates.

**[13]** Accordingly, the judgment of the district court is REVERSED, and the case is REMANDED to the district court for proceedings consistent with this decision.

---

RYMER, Circuit Judge, dissenting:

I part company because until now, no one has ever held that an adult may be an Indian (for purposes of legal status, not for purposes of ethnicity) when she is neither enrolled as a member of a tribe nor eligible for membership, nor entitled to tribal or government benefits to which only Indians are entitled; our law does not require us to allow Bruce to put her legal status as an Indian into play — and thus to shift the burden to the government to prove beyond a reasonable doubt that she is *not* an Indian — in the absence of any evidence that she is at least eligible for tribal membership or recogni-

tion; and it makes no sense to do so, for the majority's contrary rule allows Bruce, on the same set of facts, to be both an Indian (who cannot be prosecuted under 18 U.S.C. § 1152) and not an Indian (who cannot be prosecuted under 18 U.S.C. § 1153).

The facts are undisputed. The evidence shows that:

- Bruce's mother, who is enrolled in the Turtle Mountain Tribe, is Indian

- Bruce is one-eighth Chippewa

- Bruce currently lives on the reservation of the Fort Peck Tribe

- Bruce associates with Indian persons

- Bruce has three children, two of whom are Indian and are enrolled in a tribe

- Bruce engaged in one sweat lodge (a ceremony that has religious significance)

- Bruce was "arrested tribal all her life"[1]

---

[1] This is the only evidence in the record about Bruce's involvement with tribal authorities. Bruce (quite properly) does not rely on anything else. While the majority disclaims reliance on two arrests reported in the Presentence Investigation Report, it nevertheless uses these incidents (both for disorderly conduct for which the disposition was "forfeit bail") and an argument made in a reply brief to bolster its position. Of course, neither was in evidence before the district court when it found that Bruce had not met her burden of production on the affirmative defense of her Indian status, and should not be considered for any purpose on appeal. Even so, these offenses show nothing pertinent because, for all we know, they are not even Bruce's and we have no way of knowing whether tribal jurisdiction was contested or conceded.

There is no evidence:

- that Bruce is an enrolled member of any tribe

- that Bruce is recognized as a tribe member by any tribe or the federal government

- that Bruce enjoys any benefits of tribal affiliation

- that Bruce is eligible for tribal membership

- that Bruce has voted in tribal elections, that she has held tribal office, that she has served on tribal juries, that she has received payments or allotments made only to Indians, or that she is employed by a tribal organization.

I agree with the district court that, as a matter of law, this evidence does not permit a jury to find that Bruce has legal status as an Indian.

The Federal Enclave Act, 18 U.S.C. § 1152, provides for the prosecution of crimes committed in Indian country by non-Indians against Indians, but its coverage does not extend to offenses committed by one Indian against the person or property of another Indian; § 1153, in turn, provides that an Indian who commits certain major crimes against the person or property of another Indian may be prosecuted under the general laws of the United States. Neither section defines "Indian." However, courts generally follow the *Rogers* test,[2] which considers "(1) the degree of Indian blood; and (2) tribal or government recognition as an Indian." *United States v. Keys*, 103 F.3d 758, 761 (9th Cir. 1996). We have held that the defendant's legal status as a non-Indian is not an element or an essential jurisdictional fact that must be charged in an indictment under § 1152. *United States v. Hester*, 719 F.2d

---

[2] *United States v. Rogers*, 45 U.S. 567 (1846).

1041, 1043 (9th Cir. 1983). Rather, as we explained in adopting the burden-shifting framework that controls § 1152 prosecutions and this case,

> [i]t is far more manageable for the defendant to shoulder *the burden of producing evidence that he is a member of a federally recognized tribe* than it is for the Government to produce evidence that he is not a member of any one of the hundreds of such tribes. We accordingly hold that the Government need not allege the non-Indian status of the defendant in an indictment under section 1152, nor does it have the burden of going forward on that issue. Once the defendant properly raises the issue of his Indian status, then the ultimate burden of proof remains, of course, upon the Government.

*Id.* at 1043 (emphasis added).

While we have stated in different contexts that enrollment is not the exclusive way to show that one is Indian,[3] we have

---

[3]*See Keys*, 103 F.3d at 761 (stating that lack of enrollment of two-year old who had been treated as member of the tribe by the tribe and her parents does not control determination of her Indian status); *United States v. Broncheau,* 597 F.2d 1260, 1263 (9th Cir. 1979) (upholding § 1153 indictment that charged defendant as an Indian against challenge that it was deficient for failing also to charge that he was enrolled as enrollment is not an "absolute requirement," nor necessarily determinative, when the indictment adequately put the defendant on notice of his classification as an Indian); Robert N. Clinton, *Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze*, 18 Ariz. L. Rev. 503, 516 (1976). The Eighth Circuit, which considers the determination of Indian or non-Indian status a conclusion of law, has broken the test into four factors which are, in declining order of importance: "1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life." *United States v. Lawrence*, 51 F.3d 150, 152 (8th Cir. 1995); *see also United States v. Torres*, 733 F.2d 449, 456 (7th Cir. 1984) (approving consideration of whether a person is recognized as an Indian by an Indian tribe, or by the federal government, and whether a person resides on an Indian reservation and holds himself out as an Indian).

recognized that tribal membership is the common thread and evidentiary means of establishing Indian status. *See Broncheau*, 597 F.2d at 1263 (observing this, and noting that the defendant admitted he was enrolled and never suggested he did not understand the term "Indian" as it applied to him). So far as I can tell, no court has ever held that an adult could have Indian legal status who was neither enrolled or eligible for enrollment, nor entitled to tribal or government benefits due only to Indians.[4] Indeed, enrollment — or at a minimum,

[4]*See, e.g.*, *United States v. Antelope*, 430 U.S. 641 (1977) (noting that because § 1153 does not apply to many individuals who are racially to be classified as Indians, the government offered proof that the defendants are enrolled members of the Coeur d'Alene Tribe and thus not emancipated from tribal relations; declining to reach question whether nonenrolled Indians may ever be subject to § 1153); *Lawrence*, 51 F.3d at 152-54 (holding that alleged victim was non-Indian given that she was not an enrolled member of the Oglala Sioux Tribe or any other tribe and wasn't eligible for enrollment because she had not completed the requirements for tribal enrollment; the medical services she had received from the Indian Health Service were not in her own right; the fact that the Oglala Sioux Tribe had taken custody and placed the victim under the care of her grandmother (an enrolled member) was too insignificant an involvement to show tribal recognition as the victim was not enrolled or eligible for enrollment; and she did not attend pow-wows, Indian dances or other Indian cultural events and lived off-reservation except for a brief period before she was abused); *United States v. James*, 980 F.2d 1314, 1319 (9th Cir. 1992) (holding that facts conclusively proved that the defendant and victim were enrolled Indians within the meaning of § 1153); *United States v. Dodge*, 538 F.2d 770, 786-87 (8th Cir. 1976) (holding that evidence of having filed an application for enrollment in the Yurok Tribe and previous entry on the Pawnee tribal roll, and the fact that defendants had held themselves out to be Indians within the meaning of § 1153, established Indian status under § 1153); *United States v. Heath*, 509 F.2d 16, 19 (9th Cir. 1974) (refusing to uphold federal jurisdiction over an individual who was anthropologically a Klamath Indian after the Termination Act ended his tribal affiliation); *United States v. Ives*, 504 F.2d 935, 953 (9th Cir. 1974) (stating, in dicta, that enrollment or lack of it is not determinative of status as an Indian; the defendant had asked that his name be removed from the rolls of the Colville Tribe but it was not done); *Ex parte Pero*, 99 F.2d 28, 30-32 (7th Cir. 1938) (holding on habeas review of a state court conviction that petitioner was Indian even though the enrolling agent for the Bad River Reservation had refused to enroll him because he belonged to the

eligibility for enrollment — may be constitutionally required to avoid equal protection problems because otherwise, enforcement of federal criminal laws would arguably be based on an impermissible racial classification. *See Antelope*, 430 U.S. at 646 (holding that there was no constitutional problem because defendants were not subjected to federal criminal jurisdiction under § 1153 on account of their Indian race, but because they are enrolled members of the Coeur d'Alene Tribe); *Keys*, 103 F.3d at 761 (noting that *Antelope* had upheld prosecution on equal protection grounds because "the term 'Indian' describes a political group or membership, not a racial group").

It is difficult to fathom what the "recognition" prong of *Rogers* means if not enrollment or eligibility for enrollment in a tribe, or receipt of tribal or federal benefits to which only Indians are entitled. Indian *ties* cannot be enough, because one can have ties without legal status. As the Supreme Court observed in *Duro v. Reina*, "[m]any non-Indians reside on reservations, and have close ties to tribes through marriage or

Lost Band of St. Croix Chippewas — an action which didn't show that the petitioner was not Indian but rather, was evidence that he was — and noting that he was the child of a full-blooded Indian of the St. Croix Band of Lake Superior Chippewas and a father who was a half-blood, had always resided on a reservation that was set aside by treaty for the LaPointe Band and other Indians who might settle with them, he maintained tribal relations with the Indians on the reservation and was recognized as a Chippewa Indian by other Indians); *Petition of Carmen*, 165 F. Supp. 942, 948 (N.D. Cal. 1958) (finding no doubt that petitioner is an Indian subject to the Major Crimes Act as he is an Indian by blood and enrolled as a member of the Mono tribe), *aff'd sub nom. Dickson v. Carmen*, 270 F.2d 809 (9th Cir. 1959); *see also Halbert v. United States*, 283 U.S. 753, 762-63 (1931) (noting the general rule that the right of individual Indians to share in tribal property depends on tribal membership); *Vezina v. United States*, 245 F. 411 (8th Cir. 1917) (holding that person who was by blood of the Fond du Lac band of the Chippewas of Lake Superior who moved to the reservation, was recognized, enrolled, and secured allotments upon the reservation were members).

long employment. Indeed, the population of non-Indians on reservations generally is greater than the population of all Indians, . . ." 495 U.S. 676, 695 (1990).

But if — as the majority holds — ties are enough for purposes of § 1152, no reason of logic, linguistics, or grammar suggests that ties should not also be enough for purposes of § 1153.[5] Yet clearly they are not. To the contrary, we have held for purposes of § 1153 that a *terminated* Klamath Indian is no longer an Indian because she lost her Indian legal status upon termination. *United States v. Heath*, 509 F.2d 16, 19 (9th Cir. 1974); *Hester*, 719 F.2d at 1043 n.2 (so noting). If that is so, then it makes no sense for an Indian who has never had tribal membership and is ineligible for it to have legal status as an Indian. A court cannot rationally hold that both things are true.

*United States v. Keys*, 103 F.3d 758 (9th Cir. 1996), which the majority points to as "instructive," op. at 532, is different. There, the question of Indian status arose with respect to a two-year old girl who was not enrolled in the Tribe. However, we decided that her lack of enrollment did not control the determination of her Indian status because she could not have enrolled herself, her mother was an enrolled member of the Colorado River Indian Tribe, the girl had one-quarter Colorado River Indian blood, the girl's custody was litigated in the Colorado River Indian Tribal Court which exercised jurisdic-

---

[5]As we observed in *United States v. Jackson*, 600 F.2d 1283, 1285-86 (9th Cir. 1979):

> Section 1153 should be read in conjunction with § 1152, which extends "the general laws of the United States as to the punishment of offenses . . . to the Indian country" with certain exceptions. . . . Thus, the general rule is that "except for the offenses enumerated in (section 1153), all crimes committed by *enrolled Indians* against other Indians within Indian country are subject to the jurisdiction of tribal courts."

*United States v. Antelope*, 430 U.S. 641, 643 n.2 (1977).

tion over her and continued to do so at the time of the federal action, and the allegations that formed the gravamen of the federal prosecution were investigated by Colorado River Indian police. *Id.* at 761. Bruce's situation differs because she is an adult who could have enrolled herself (if she were eligible), she has one-eighth Chippewa blood (which is not the bloodline of the Ford Peck tribes), and she was not under the jurisdiction of any tribal court at the time of the federal action.

In sum, the district court got the test right, correctly construed the facts in the light most favorable to Bruce, and concluded that, as a matter of law, the evidence adduced by Bruce does not permit a reasonable inference that she has Indian legal status. Applying the *Rogers* test, the district court acknowledged evidence of some Indian blood possessed by Bruce. This evidence shows that she is one-eighth Chippewa, but there is no evidence that this meets the quantum of blood requirement for recognition by that tribe. As Judge Canby notes in his *Nutshell*, tribes have different blood requirements for enrollment; many require one-fourth tribal blood, and at least one requires five-eighths.[6] William C. Canby, Jr., *American Indian Law in a Nutshell* 10 (4th ed. 2003). Regardless, there is no evidence that Bruce is enrolled as a member of the Turtle Mountain Tribe — where her mother is enrolled — or of the Sioux or Assiniboine tribes which are the two tribes at Ford Peck, where Bruce now lives, or of any Chippewa tribe. There is no evidence that she is eligible for membership. There is no evidence that Bruce holds herself out as Indian; although she enrolled two of her three children, she has not enrolled (or for all that appears, ever tried to enroll) herself.

---

[6]One circuit court (functioning as a trial court) found based on evidence of custom and prior enrollment that one-eighth blood was sufficient to be enrolled as a member of a particular tribe that the persons involved (who were of mixed Indian blood) had chosen to identify themselves with, and to be entitled to tribal benefits. *Sully v. United States*, 195 F. 113 (C.C.D.S.D. 1912). Whether or not one-eighth blood is sufficient in some cases, there is no evidence in this case that it would suffice for purposes of membership in, or identification with, any relevant tribe.

This indicates that she either knows that she cannot be a tribal member, or does not wish to identify herself as one. There is no evidence that she has received benefits, payments, or allotments to which only an Indian is entitled. Nor is there any evidence that Bruce has taken part in tribal affairs by voting, serving on juries, or holding office. There is no evidence that Fort Peck has been involved in her life in a significant enough way to constitute recognition; and conversely, visiting a sweat lodge with her mother on one occasion does not manifest participation in Indian life or heritage to any substantial extent. The only evidence of Bruce's legal status as an Indian comes from the fact that her mother is an enrolled member of the Turtle Mountain Tribe, Bruce was "arrested tribal," was married for a time to an Indian, has two enrolled children, lives on the Fort Peck reservation (which is home to tribes with which she has no blood relationship), and socializes with others on the reservation because of her children. This could well be true of a lot of people, for many non-Indians live on Indian reservations, where they too get in trouble, socialize with Indians, marry Indians, and have children who are recognized as Indian. These facts alone do not raise an inference that Bruce has been recognized by any tribe or the government.

Accordingly, the district court correctly concluded that Bruce failed to produce sufficient evidence to support a finding that she has legal status as an Indian. I would not cut a new path that allows someone to have the legal status of an Indian, and not an Indian, on the same set of facts that does not include enrollment, eligibility for enrollment, or entitlement to Indian benefits as a common denominator. I therefore dissent.