**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jack Alan GESTON, Defendant–Appellant.**

**United States of America, Plaintiff–Appellant,**

v.

**Jack Alan Geston, Defendant–Appellee.**

Nos. 01–50081, 01–50163.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 2002.

Filed Aug. 13, 2002.

Karyn H. Bucur, Laguna Hills, California, for the defendant-appellant.

Jennifer Levin, Department of Justice, Washington, DC, for the plaintiff-appellee.

Before BROWNING, THOMAS and RAWLINSON, Circuit Judges.

## OPINION

RAWLINSON, Circuit Judge.

Defendant/Appellant Jack A. Geston ("Geston") appeals his conviction for violations of 18 U.S.C. § 242 (unreasonable use of force under color of law) and 18 U.S.C. §§ 113(a)(3), (6) and (7) (assault with a dangerous weapon resulting in serious bodily harm). The government filed a cross-appeal of the sentence on the basis that the court erred in not enhancing Geston's sentence because he committed the offense while acting as a police officer.

## BACKGROUND

Geston, a police officer with the Department of Defense ("DOD"), was charged with assaulting Seaman Apprentice Jose Hernandez III ("Hernandez") on board the U.S.S. Rentz.

Geston first encountered Hernandez at a fast food restaurant. Having failed a field sobriety test, Hernandez was handcuffed and taken to the police station by Geston and his partner for the evening, Petty Officer William Garrett ("Garrett"). Hernandez was later returned to his ship by the two officers.

Upon entering the ship, Geston and Garrett escorted Hernandez to the podium where Petty Officer Holden ("Holden"), the officer of the deck, was stationed. As Hernandez proceeded into the ship's passageway, he called Geston a "stupid fat fuck." There is conflicting testimony as to what happened next.

*Hernandez' Version:*

Hernandez was pushed from behind and "hit the right side of the ship's wall." As he turned around, Geston pushed and punched him, resulting in Hernandez pushing back at Geston, causing both of them to fall to the ground. Hernandez felt something hard hit his head, causing him to bleed. Hernandez responded by punching Geston once. Geston then "put Hernandez down," resulting in Hernandez lying face up on the ground. Geston straddled Hernandez and placed his baton close to Hernandez' throat. Hernandez attempted to take the baton off his throat because of breathing difficulty. Petty Officer Groot ("Groot") held Hernandez' hand while another person (unidentified) grabbed Hernandez. Hernandez was turned over face down and Geston held Hernandez' face on the non-skid (the floor of the ship). When Hernandez was instructed to place his hands behind his back, he had trouble complying because his shoulder hurt from a prior incident. Hernandez remembers pressure being applied to his back, but could not identify the source of the pressure. Paramedics removed Hernandez from the ship on a stretcher and transported him to the hospital. After the incident, Hernandez experienced a sore shoulder, an achy back, a painful jaw and a sore throat.

*Geston's Version:*

After Hernandez swore at Geston, Geston placed his hand out with his fingers open and said "Hey." Hernandez immediately swung around and hit Geston in the face with a closed fist. Geston tripped as he tried to grab Hernandez, and fell to the ground with Hernandez on top of him. Hernandez then began hitting Geston in the face and wherever else he could connect. At that point, Geston became con-

cerned for his life because his gun was loaded and the safety was off. During the altercation, Geston was yelling "get this guy off of me." As Garrett was attempting to hold Hernandez down, Hernandez broke away. Hernandez charged Geston, and landed on the ground. Hernandez continued to swing his arms at Geston and hit him in the face continuously while exclaiming "you asshole, get off me you asshole." In order to restrain Hernandez, Geston placed him on the ground and lay on top of him. Geston drew his baton in order to gain control. He delivered three blows to Hernandez, one accidently hitting him in the head. Upon delivery of the third blow, Hernandez knocked the baton out of Geston's hand. Petty Officer Hamblin returned Geston's baton to him. Geston then hollered "[i]s anybody going to help me?" Geston placed the baton across Hernandez' chest and Hernandez began growling and spitting at Geston's face. Geston attempted to put the baton under Hernandez' chin in order to stop Hernandez from spitting on him. As Geston sat up on his knees, Hernandez kicked Geston in the ear.

Additional officers arrived on the ship, and Officer Raftis ("Raftis") and DOD Lieutenant Sims ("Sims") assisted Geston in getting the situation under semi-control. Geston placed his foot on Hernandez' back to keep him down. Raftis regained control of Hernandez' hands and feet and Geston was able to handcuff him. After the incident, Geston returned to the police station and then went to the hospital with Officer Capers to have his injuries checked. Geston had a cut above his ear, scratches, and soreness to his elbows, shoulders, and knees.

The treating physician at the hospital, Dr. Woodson, testified that Hernandez was loud, combative and verbally uncooperative, but calmed down quickly. Dr. Woodson treated Hernandez for a scalp lacera-

tion (three centimeters), and shoulder and back pain. Dr. Woodson noted Hernandez had an abrasion on his right cheek and neck along with some bruising. Hernandez did not have any broken bones or tenderness in the cervical spine. Hernandez also had extensive bruising in the chest area, but x-rays revealed no broken bones. His blood alcohol level was 0.087. The nurse's report noted Hernandez could speak in full sentences, an indication that Hernandez had no trouble breathing.

Geston's first trial resulted in a mistrial, with the jury unable to reach a verdict. Following a second jury trial, Geston was convicted of both charges.

## DISCUSSION

### 1) Allegations of False Testimony

Geston asserts that the government allowed prosecution witnesses Sims and Officer Carr ("Carr") to testify falsely that Garrett carried a wooden baton on November 26, 1997, rather than a black metal retractable baton. Geston contends that the government highlighted this false testimony through Garrett's cross-examination, Carr's rebuttal testimony, and closing argument.

Geston proffers the following evidence that Sims' and Carr's testimony was false and the government knew it was false: (1) Sims signed the Evidence Property Custody Receipt indicating Garrett had a retractable black baton on November 26, 1997; (2) the DNA blood analysis performed by the FBI on the black retractable baton Garrett surrendered revealed that Hernandez was a potential contributor of the blood; and (3) FBI Special Agent Jeffrey M. Thurmond took possession of Garrett's black retractable baton on February 24, 2000.

Because Geston failed to raise this issue at trial, we review for plain error. *United States v. Tanh Huu Lam,* 251 F.3d 852, 861 (9th Cir.2001). "To se-

cure reversal under this standard, [Geston] must prove that: (1) there was 'error'; (2) the error was plain; and (3) the error affected 'substantial rights.'" *United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir.1999) (quoting *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir.1997)) (citing *United States v. Olano*, 507 U.S. 725, 730–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). "Under this standard, a conviction can be reversed only if, viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice." *Tanh Huu Lam*, 251 F.3d at 861 (citation omitted).

 It is a prosecutor's duty to "refrain from knowingly presenting perjured testimony and from knowingly failing to disclose that the testimony used to convict defendant was false." *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir.1991) (internal quotation marks and citation omitted); *see also United States v. Endicott*, 869 F.2d 452, 455 (9th Cir.1989). However, the evidence proffered by Geston does not establish that the government knew, or should have known, that Sims' and Carr's testimony was false. *See United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir.1989). At most, two conflicting versions of the incident were presented to the jury. It was within the province of the jury to resolve the disputed testimony. *See United States v. Awkard*, 597 F.2d 667, 671 (9th Cir.1979) (recognizing that credibility determinations are for the jury). The district court did not commit plain error in allowing the prosecution to present the testimony of Sims and Carr to the jury.

**2) Cross–Examination of Witnesses**

Geston asserts that the government committed prosecutorial misconduct by asking Groot and Garrett whether other law enforcement witnesses were lying. Geston also asserts that during cross-examination, the government repeatedly and improperly asked Garrett to comment on the veracity of other witnesses. The Government contends that even if there was error in their prosecution, it was harmless. Because Geston did not make a timely objection to these alleged acts of prosecutorial misconduct, review is limited to plain error. *Sanchez*, 176 F.3d at 1218.

*Groot's Testimony:*

Groot's testimony on cross-examination required him to comment on the difference between his testimony and Holden's testimony. The challenged testimony proceeded as follows:

Q: Are you aware that Petty Officer Holden testified that Officer Geston gave him the form 629 that evening?

A: No, sir.

Q: You are not aware of that?

A: No sir.

Q: If officer—if Petty Officer Holden said that it was Officer Geston who gave him the form 629 at the podium, would Petty Officer Holden be lying?

(Defense attorney): Objection, relevancy, asked and answered.

The Court: Overruled. You can answer that.

Q: Would Petty Officer Holden be lying?

A: No, Sir.

. . .

Q: Are you aware that Petty Officer Holden, officer of the deck, testified that, when the handcuffs were released, Seaman Hernandez was not at the podium but Seaman Hernandez was over here by this left pole area?

A: No, Sir.

Q: Okay. If Petty Officer Holden testified to that effect, would he be lying?

A: I believe not.

. . .

Q: You don't remember where Seaman Hernandez was that evening, do you [?]

A: I believe he was around the podium area.

Q: But if Petty Officer Holden said he was over by the pole, would he be lying?

(Defense attorney): Objection, asked and answered.

The Court: Sustained. That's arguing with him . . .

. . .

Q: Are you aware that Petty Officer Holden said that the fight did not or the struggle did not start outside the passageway but started inside the passageway?

A: I'm not aware of that.

Q: If Petty Officer Holden testified to that effect, would he be lying?

A: I wouldn't believe he would be lying, no.

*Garrett's Testimony:*

Similarly, the government questioned Garrett about the testimony of Sims, Carr, Raftis, Holden, and Groot. The majority of the challenged portions of Garrett's cross-examination inquired if Garrett would change his testimony if he knew that other officers had testified to the contrary, or alternatively, if the other officers were mistaken in their respective recollections.

■ These questions were improper because they compelled Groot and Garrett to offer opinions regarding the veracity of the government witnesses. *Sanchez,* 176 F.3d at 1220; *United States v. Richter,* 826 F.2d 206, 208 (2d Cir.1987) (holding that a prosecutor is guilty of misconduct when the defendant is forced to testify that an FBI agent was either mistaken or lying); *United States v. Sullivan,* 85 F.3d 743, 749–50

(1st Cir.1996) ("[C]ounsel should not ask one witness to comment on the veracity of the testimony of another witness"); *United States v. Boyd,* 54 F.3d 868, 871 (D.C.Cir.1995) ("[i]t is therefore error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand") (citation omitted).

■ We have held that it is reversible error for a witness to testify over objection whether a previous witness was telling the truth. *United States v. Sanchez–Lima,* 161 F.3d 545, 548 (9th Cir.1998). "It is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience." *Id.* (citation omitted). "Testimony regarding a witness' credibility is prohibited unless it is admissible as character evidence." *Id.* (citation omitted).

■ A prosecutor's improper questioning is not in and of itself sufficient to warrant reversal. *Ortiz v. Stewart,* 149 F.3d 923, 934 (9th Cir.1998). It must also be determined whether the prosecutor's actions "seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice." *United States v. Tanh Huu Lam,* 251 F.3d 852, 862 (9th Cir.2001) (citation omitted). Under the circumstances of this case, we hold that improper questioning by the prosecution resulted in reversible error. Geston's first trial, which did not include the improper questioning, resulted in a mistrial, with the jury unable to reach a verdict. This circumstance leads us to conclude that the improper questioning impacted Geston's due process rights. In fact, the district court specifically noted that one of the few differences between the first and second trials was the aggressive attack on Garrett's credibility. This case was a close one, as evidenced by the first jury's inability to reach a verdict.

Geston's fate hinged on resolution of the conflicting testimony presented by the parties. We may consider the relative strength of the parties' positions in deciding whether reversal is appropriate. *United States v. Kerr,* 981 F.2d 1050, 1054 (9th Cir.1992). In a case where witness credibility was paramount, it was plain error for the court to allow the prosecutor to persist in asking witnesses to make improper comments upon the testimony of other witnesses.

### 3) Prior Bad Acts Evidence

Before the first trial, Geston filed a motion in limine seeking to introduce evidence that Hernandez was previously involved in two violent incidents after drinking alcohol. The motion was denied. Geston challenged this ruling with the district court judge who presided over the second trial, to no avail. On appeal, Geston asserts that the district court's denial of his opportunity to cross-examine Hernandez about the two confrontations violated Federal Rule of Evidence ("Fed. R.Evid.") 608(b).

The first incident in question occurred in Mazatlan, Mexico. Hernandez was on shore leave and returned to the ship intoxicated. Upon his return, Hernandez stated that he was attacked by a security guard at a hotel and severely injured the guard in self defense. The second incident occurred while the ship was in dry dock in San Diego. Hernandez reportedly "choked out" another crew member, and was charged with assault.[1]

■ We review the district court's refusal to admit impeachment evidence for

an abuse of discretion. *United States v. Rowe,* 92 F.3d 928, 933 (9th Cir.1996). The district court's decision to exclude cross-examination into specific instances that are allegedly probative of truthfulness or untruthfulness under Rule 608(b), and rulings under Federal Rule of Evidence 404 are also reviewed for abuse of discretion. *U.S. v. McCoy,* 28 F.3d 217 (9th Cir.1994); *see United States v. Conners,* 825 F.2d 1384, 1390 (9th Cir.1987).

#### a. *Rule 608(b)*

Rule 608(b) allows a witness to be cross-examined, in the discretion of the court, regarding specific instances of misconduct which do not lead to conviction, if the misconduct is probative of the witness' character for truthfulness or untruthfulness.[2]

■ Specific bad act evidence is admissible under Rule 608(b) "for the purpose of attacking or supporting the witness credibility" if it is probative of the "witness' character for truthfulness or untruthfulness" or "challenges a witness's credibility." *See United States v. Gay,* 967 F.2d 322, 327–28 (9th Cir.1992). Neither of the prior incidents involving Hernandez constitutes conduct which is probative of Hernandez' character for untruthfulness or his credibility. Accordingly, the district court did not abuse its discretion in excluding the proffered evidence under Rule 608(b).

#### b. *Fed.R.Evid. 404(a)(2) and (b)* [3]

■ Rule 404(a) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose

---

**1.** Because this incident occurred after Geston's altercation with Hernandez, the district court could also have excluded this evidence on the basis that it lacked relevance. *See* Fed.R.Evid. 401, 402.

**2.** Fed.R.Evid. 403 modifies this rule by providing that otherwise admissible and relevant

evidence may be excluded if the court determines that its probative value is substantially outweighed by the danger of unfair prejudice.

**3.** Although the court also analyzed the admissibility of the proffered evidence under Rule

**1138**

of proving action in conformity therewith on a particular occasion...." However, Rule 404(a)(2) allows admission of "[e]vidence of a pertinent trait of character of the alleged victim of the crime offered by an accused." Nevertheless, the district court did not abuse its discretion in excluding the proffered evidence of prior incidents of violence under Rule 404(a)(2), because "only reputation or opinion evidence is proper to show that the victim of an assault had a propensity towards violence." *United States v. Keiser*, 57 F.3d 847, 855 (9th Cir.1995).

**4) Cumulative error**

 Geston asserts that even if the asserted errors do not individually warrant reversal, their cumulative effect does. Because there is only one error in this case, cumulative error analysis is not triggered. *See Mancuso v. Olivarez*, 282 F.3d 728, 745 (9th Cir.2002).

### *CONCLUSION*

There was no prosecutorial misconduct in the presentation of testimony regarding Garrett's possession of a wooden baton. The district court did not abuse its discretion in denying Geston's motion in limine seeking the introduction of 'prior bad acts' evidence. However, the district court plainly erred in allowing the prosecutor to persist in asking witnesses to comment upon the veracity of other witnesses.

Accordingly, Geston's conviction is RE-VERSED and this case is REMANDED for a new trial.[4]

REVERSED and REMANDED. Each party is to bear its costs on appeal.

---

608(b), Geston initially sought admission of the evidence under Rule 404(a)(2) and (b).

4. Due to our remand for a new trial, we need not address the government's cross appeal.