**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

MIGUEL ANGEL RAMIREZ,
            *Defendant-Appellant.*

No. 07-10263

D.C. No.
CR-04-01127-FRZ

OPINION

Appeal from the United States District Court
for the District of Arizona
Frank R. Zapata, District Judge, Presiding

Argued and Submitted
May 13, 2008—San Francisco, California

Filed August 11, 2008

Before: Andrew J. Kleinfeld and N. Randy Smith,
Circuit Judges, and Richard Mills,* District Judge.

Opinion by Judge N. Randy Smith

*The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

## COUNSEL

J. Thomas Poore, Tucson, Arizona, for the defendant-appellant.

George Ferko, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellee.

---

**OPINION**

N.R. SMITH, Circuit Judge:

The district court did not err when it declined to dismiss for lack of jurisdiction, because the government sufficiently proved that the victims were "Indians" within the meaning of 18 U.S.C. § 1152. We further hold that the district court did not abuse its discretion when it declined to require that the jury return a special verdict form, because the district court: (1) sufficiently explained its decision not to require a special verdict; (2) instructed the jury that it must unanimously reject Miguel Angel Ramirez's self-defense theory in order to find Ramirez guilty; and (3) ensured that the jury understood that the government bore the burden of disproving Ramirez's defense. The district court also did not plainly err by referring the jury back to the original jury instructions, in response to the jury's question about specific intent, because Ramirez agreed that no supplemental instruction should be given, and the instructions already addressed the jury's question. Lastly, under the plain error standard, Ramirez's right to a fair trial was not violated by the prosecutor compelling Ramirez to call other witnesses liars, because Ramirez has not demonstrated that he was prejudiced by the admission of his testimony or that the prosecutor's actions constituted a miscarriage of justice. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

**I.   BACKGROUND**

Ramirez lived in the home of Teresa Valenzuela ("Teresa"), Teresa's mother, Dolores Valenzuela ("Dolores"), and Teresa's father and brother, on the Tohono O'Odham Indian Reservation ("Reservation") in Arizona. On April 17,

2004, the Valenzuela family discovered that Ramirez had been using Dolores's debit card to steal money from her bank account. The Valenzuela family immediately asked Ramirez to leave the home.[1]

During the course of the week following Ramirez's departure from the Valenzuela home, Ramirez telephoned Teresa multiple times per day. One evening, Ramirez entered the Valenzuela home (using a house key he had been given) and Teresa's bedroom as she slept. Dolores, upset by the incident, purchased new locks for the home. The new locks, however, were not the correct size and were never installed.

On April 23, 2004, Dolores and Teresa went to the bank and discovered nearly $1,000 in recent unauthorized withdrawals from Dolores's account. As a result, Dolores filed a fraud report with her bank. While Teresa and Dolores were in the bank reporting the fraud, Ramirez again telephoned Teresa. Teresa told him that Dolores was reporting the theft. Dolores also spoke to Ramirez and told him that she would be pursuing criminal charges. Ramirez admitted to Dolores that he had stolen over $3,000 from her, but promised to pay her back.

On the morning of April 24, 2004, Ramirez returned to the Valenzuela home. Ramirez was aware that Teresa's father and brother were not at the Valenzuela home that morning. The parties dispute what occurred after his arrival. Ramirez's description of what occurred after his arrival is vastly different from that of Teresa and Dolores. Ramirez testified that he returned to the house to retrieve the car keys to an inoperable vehicle that he had left there. When he arrived at the house, he knocked several times on the front door. Because no one answered, he began to open the door with the house key that was in his possession. Before he was able to open the door

---

[1]Ramirez, however, testified that he left the Valenzuela home on his own before the theft was discovered, because he did not feel comfortable.

with his key, Dolores opened it for him and admitted him into the home to retrieve his vehicle keys. While Ramirez talked with Teresa, Dolores attacked him from behind with a kitchen knife. Ramirez pulled out his butterfly knife and fought off Dolores in self-defense.

Teresa and Dolores, however, testified that they awoke on April 24, 2004 to the sound of their dog barking. As they met in the living room, Dolores and Teresa heard the sound of a key turning "real slowly" in the front door lock. Dolores went to the front door as it was opening and blocked it with her body. Ramirez was standing at the door and asked if he could come inside. According to Dolores and Teresa, Dolores refused to let Ramirez inside and threatened to call the police. Ramirez, however, forced the door open — pushing Dolores backwards. Ramirez then began stabbing Dolores repeatedly with a knife, after which he began to stab Teresa. Dolores attempted to place her body between Teresa and Ramirez in an attempt to protect Teresa and made several attempts to grab the knife out of Ramirez's hand. Teresa testified that Dolores screamed for Teresa to get out of the house and to get help. Teresa was able to escape to a neighbor's house and waited there for the paramedics to arrive.

At some point during the struggle, Dolores grabbed a knife and stabbed Ramirez in the throat, causing him to immediately fall down. Dolores again stabbed Ramirez in the throat and then left the house. When the police arrived, they found Ramirez on the floor.

A federal grand jury indicted Ramirez on two counts of assault with intent to commit murder on an Indian reservation, in violation of 18 U.S.C. §§ 113(a)(1) and 1152, and two counts of assault with a dangerous weapon with intent to do bodily harm on an Indian reservation, in violation of 18 U.S.C. §§ 113(a)(3) and 1152.

At trial, the treating trauma surgeon (an expert as to trauma surgery and trauma service) testified that Teresa had been

stabbed at least 17 times, including multiple stab wounds to her chest, abdomen, back, arms, and right hand. The trauma surgeon also testified that Dolores had been stabbed at least 28 times, and had multiple wounds inflicted to her face, jaw, chest, abdomen, back, underarm, and the web spacing between her fingers. The trauma surgeon also indicated that the wounds on Dolores's hands "suggest[ed] someone trying to defend them[self] from a stab by trying to grab the knife away." A forensic pathologist testified that, in his expert opinion, the wounds suffered by both Dolores and Teresa were consistent with a person defending herself. Testimony at trial also established that Ramirez had far fewer injuries than Teresa or Dolores. Ramirez had multiple stab wounds in the neck, had five stab wounds on his upper back, and may have had one on his arm.

Ramirez called a DNA expert, who testified regarding the blood found on the knives recovered from the crime scene. The DNA expert testified that Ramirez's blood was only identified on one of the knives. She also testified that the major contributor of the blood samples on two of the knives was Dolores, and that the major contributor of the blood sample on the knife Ramirez admittedly brought into the home with him was Teresa.

At the close of the government's case-in-chief, Ramirez moved for a judgment of acquittal, primarily arguing that the evidence was insufficient to support a finding that the victims were "Indians." The district court denied the motion. At the close of all testimony, Ramirez renewed his motion, which the district court again denied.

Before the case went to the jury, Ramirez requested that the jury be provided with a special verdict form to ensure unanimity regarding Ramirez's affirmative defense that he acted in self-defense. The district court declined to include a special verdict form and instead added the language "with you all agreeing" to the self-defense instruction as recommended by

the commentary to Ninth Circuit Model Jury Instruction 7.9. The district court found that a special verdict form would be inappropriate because it might impermissibly shift the burden of proof on that issue to Ramirez.

After the jury was instructed and began deliberating, the jury submitted a question to the district court, asking, "What constitutes specific intent to commit murder?" All parties agreed that the existing jury instruction, which followed Ninth Circuit Model Jury Instruction 8.4 for "Assault with Intent to Commit Murder," adequately addressed the jury's question, and that the jury should be referred to the original jury instructions. Ramirez's counsel explicitly noted that the Ninth Circuit Model Jury Instructions state that "specific intent" is not defined and recommended that the district court tell the jury "that the court cannot provide you with such a definition."

On June 22, 2006, the jury convicted Ramirez on all charged counts. After the jury's guilty verdict, Ramirez filed a motion for judgment of acquittal and new trial. Although Ramirez had concurred with the district court's answer to the jury's question at the time, Ramirez's motion argued that the court should have provided the jury with a "specific intent" definition.

At the September 18, 2006 hearing on the motion, Ramirez repeated his argument regarding the definition of "specific intent" and contended, for the first time, that the jury's question indicated that the evidence was insufficient to establish his intent to commit murder for purposes of counts one and three.[2] The district court rejected these arguments.

---

[2] Counts one and three of the Superceding Indictment charged Ramirez with assault and intent to commit murder, in violation of 18 U.S.C. §§ 113(a)(1) and 1152. Count one charged Ramirez with assault and intent to commit murder in reference to "T.L.V." (Teresa), and count three charged Ramirez with assault and intent to commit murder in reference to "D.V." (Dolores).

The district court additionally rejected Ramirez's untimely motion for judgment of acquittal on counts one and three, finding that the evidence of Ramirez's intent to murder Dolores and Teresa was "overwhelming." Accordingly, the district court denied Ramirez's motions for a new trial and for a judgment of acquittal.

## II. STANDARDS OF REVIEW

"We review de novo the district court's determination of Indian status under 18 U.S.C. § 1152 because it is a mixed question of law and fact." *United States v. Bruce*, 394 F.3d 1215, 1218 (9th Cir. 2005). We also review de novo the denial of a motion to acquit for insufficient evidence. *See United States v. Hardy*, 289 F.3d 608, 612 (9th Cir. 2002). Viewing the evidence in the light most favorable to the government, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

We review a district court's formulation of jury instructions for abuse of discretion. *See United States v. Shipsey*, 363 F.3d 962, 967 n.3 (9th Cir. 2004). We also review a district court's decision to use a special verdict form for abuse of discretion. *See United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998). "Jury instructions, even if imperfect, are not a basis for overturning a conviction absent a showing that they prejudiced the defendant." *United States v. Frega*, 179 F.3d 793, 807 n.16 (9th Cir. 1999).

We ordinarily review a district court's response to a jury question for abuse of discretion. *See United States v. Romero Avila*, 210 F.3d 1017, 1024 (9th Cir. 2000). We review the district court's response to the jury's question in this case for plain error, however, because Ramirez did not object to the court's decision to refer the jury back to its original jury

instructions. *See United States v. McIver*, 186 F.3d 1119, 1130-31 (9th Cir. 1999).

Because Ramirez did not object to the prosecutor's questions regarding the veracity of other witnesses, instead raising the issue of alleged trial error for the first time on appeal, we review only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 730-36 (1993). Under the plain error standard, relief is not warranted unless there has been: (1) error, (2) that was plain, and (3) that affected substantial rights. *See United States v. Recio*, 371 F.3d 1093, 1100 (9th Cir. 2004). Under the third limitation of the plain error standard, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. Rule 52(b) normally requires that we make "the same kind of inquiry, with one important difference: It is the defendant rather than the government who bears the burden of persuasion with respect to prejudice." *Id*. If those conditions are met, we may exercise our discretion to notice the error only if the prosecutor's actions, "viewed in the context of the entire trial . . . seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice." *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (quoting *United States v. Tanh Huu Lam*, 251 F.3d 852, 861 (9th Cir. 2001)).

## III.  DISCUSSION

### A.  The District Court's Jurisdiction Under 18 U.S.C. § 1152

Ramirez argues that the district court should have dismissed for lack of jurisdiction because there was insufficient evidence that the victims were "Indians" within the meaning of 18 U.S.C. § 1152. He contends that the documents produced at trial failed to establish that the victims had ever completed the application process and become certified members

of the Tohono O'Odham Nation ("Nation"). Ramirez argues that the documents were simply applications to join the Nation and did not meet the standard of a Certified Tribal Enrollment Roster. We disagree.

[1] Section 1152 provides "for the prosecution of crimes committed in Indian Country by non-Indians against Indians." *United States v. Keys*, 103 F.3d 758, 761 (9th Cir. 1996) (citation omitted). While the term "Indian" has not been statutorily defined, "[t]he generally accepted test for Indian status considers (1) the degree of Indian blood; and (2) tribal or government recognition as an Indian." *Bruce*, 394 F.3d at 1223 (internal quotation marks and citations omitted). The first prong requires "some" Indian blood. *Id*. Thus, "evidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong." *Id*.

The second prong requires evidence that "the Native American has a sufficient non-racial link to a formerly sovereign people." *Id*. at 1224 (citation omitted). Courts analyzing this prong have considered evidence of: "1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life." *Id*. (internal quotation marks and citation omitted).

[2] The district court correctly found that the government presented sufficient evidence of Dolores's and Teresa's status as Indians. First, both Dolores and Teresa testified that they were members of the Nation, and that they resided in the San Xavier district, which is part of the Nation. Teresa testified that Dolores had enrolled her in the Nation when she was a child. As a result of her enrollment, she was given a tribal identification card stating that she is a member of the Nation.

Second, Dolores and Teresa presented Certificates of Final Determination of Approval by Tohono O'Odham Nation of Application for Enrollment. Both certificates noted the dates when the applications for enrollment were submitted, the dates when the hearings on the applications were held, and the Tohono O'Odham Council's ("Council") determination that both were "eligible for enrollment as a member of the Tohono O'Odham Nation." The Council also made "a final determination of approval" on both certificates and ordered that Dolores's and Teresa's names "be placed upon the membership roll of the Nation."

Lastly, the Director of Membership Services for the Nation explained to the jury that San Xavier is located within the Reservation, and that an individual must be a member of the Nation to reside on the Reservation and receive a tribal identification card. The director noted that enrollment in the Nation was based on lineage and descendancy. An applicant therefore had to prove that he or she was a descendant of another member of the Nation. After examining both Dolores's and Teresa's certificates, the director stated that both women were enrolled members of the Nation.

Thus, the evidence was sufficient to establish both Dolores's and Teresa's status as "Indians" within the meaning of § 1152. *See Bruce*, 394 F.3d at 1223-24; *Duro v. Reina*, 851 F.2d 1136, 1144 (9th Cir. 1987), *rev'd on other grounds*, 495 U.S. 676 (1990). Accordingly, we hold that the district court correctly ruled that it had jurisdiction to hear the case.

## B. Ramirez's Request for a Special Verdict Form

Ramirez contends that the district court abused its discretion by not requiring the jury to return a special verdict form stating that the jury unanimously agreed that Ramirez did not act in self-defense. We disagree.

**[3]** "Although there is no per se prohibition, '[a]s a rule, special verdicts in criminal trials are not favored.' " *Reed*, 147

F.3d at 1180 (quoting *United States v. O'Looney*, 544 F.2d 385, 392 (9th Cir. 1976)) (brackets in original). "This rule is fashioned to protect the rights of criminal defendants by preventing the court from pressuring the jury to convict." *Id.* Whether or not it is appropriate to use "a special verdict should be determined according to 'the particular circumstances of [each] case.' " *Id.* (quoting *O'Looney*, 544 F.2d at 392) (brackets in original). We noted in *Reed* that "[v]erdict forms are, in essence, instructions to the jury." *Id.*

**[4]** The district court appropriately instructed the jury that it must unanimously reject Ramirez's self-defense theory in order to find Ramirez guilty. *Cf. United States v. Southwell*, 432 F.3d 1050, 1053 (9th Cir. 2005) (noting that "[t]he failure to properly instruct the jury on the unanimity requirement was constitutional error"). The district court included a specific unanimity instruction within the self-defense instruction, stating that "[t]he government must prove beyond a reasonable doubt, with all of you agreeing, that the defendant did not act in reasonable self-defense." That instruction conformed with both Ninth Circuit Model Jury Instruction 6.7 ("Self-Defense") and Ninth Circuit Model Jury Instruction 7.9 ("Specific Issue Unanimity"). The unanimity requirement was unambiguous, *cf. Southwell*, 432 F.3d at 1053 (discussing how "[t]he jury could reasonably have read the [unanimity] instructions one of two ways" and that "referring the jury back to the instructions did nothing to clear up the ambiguity"), and the instruction properly informed the jury that the government bore the burden of disproving Ramirez's defense, *cf. United States v. Pierre*, 254 F.3d 872, 875-76 (9th Cir. 2001) (noting that a district court commits "reversible error by not specifically instructing the jury that the government had the burden of proof of disproving self-defense") (internal quotation marks and citation omitted)).

**[5]** The district court also sufficiently explained its decision not to include a special verdict form. The court explained that Ramirez's suggested wording of the form would be confusing

and would improperly shift the burden of proof to Ramirez. Accordingly, the district court did not abuse its discretion by declining to require that the jury return a special verdict form.

## C.   Jury Question Regarding "Specific Intent"

Ramirez argues that the district court erred by referring the jury back to the original jury instructions when the jury asked a question about the definition of specific intent. Ramirez contends that the district court plainly erred by failing to provide the jury with a supplemental instruction defining "specific intent." We disagree.

**[6]** The Ninth Circuit Model Criminal Jury Instructions advise district courts to avoid jury instructions that set out the distinction between "general intent" and "specific intent," and to instead define the precise mental state required for the particular offense charged. *See* 9th Cir. Crim. Jury Instr. 5.4 (2003). The district court, therefore, "avoided the possible error sometimes found in trying to elaborate on a given instruction" by referring the jury back to its original instructions. *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1202 (9th Cir. 2000). During deliberations, both the government and Ramirez agreed that the current instructions adequately addressed the jury's question, and that the district court should refer the jury to the instructions that the district court had already provided. Ramirez's counsel also explained to the district court that the Model Jury Instructions state that "specific intent" is not defined, and recommended that the district court tell the jury "that the court cannot provide you with such a definition."

**[7]** Because Ramirez clearly demonstrated that he understood the law and still agreed that the jury should be referred to the original instructions, it is "too late for [him] to complain now." *See Alvarez-Valenzuela*, 231 F.3d at 1202; *see also United States v. Perez*, 116 F.3d 840, 844-45 (9th Cir. 1997) (holding that a district court does not plainly err by giv-

ing a jury instruction when the defendant has demonstrated an awareness of the applicable law and nevertheless accepts the allegedly flawed instruction). Accordingly, we hold that the district court did not plainly err when it answered the jury's question by referring the jury back to its original instructions. *See McIver*, 186 F.3d at 1130-31.

## D.    Ramirez's Right to a Fair Trial

**[8]** For the first time on appeal, Ramirez argues that, during his cross-examination as a witness, the prosecutor compelled him to say that he was telling the truth and that other witnesses were lying. Ramirez contends that his right to a fair trial was therefore violated. We disagree.

**[9]** It is generally improper for an attorney to compel a witness to testify that another witness lied. *See United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004); *Geston*, 299 F.3d at 1136. "Testimony regarding a witness' credibility is prohibited unless it is admissible as character evidence." *Geston*, 299 F.3d at 1136. (internal quotation marks and citation omitted). During the prosecutor's cross-examination of Ramirez, the following exchanges took place:

> Q:   Despite hearing the testimony from Teresa and Dolores and Mr. Valenzuela and Luis, all of them said you were asked to leave, you are telling us that you left on your own. Isn't that what you are trying to tell us?
>
> A:   Yes.
>
> Q:   They are lying and you are telling the truth?
>
> A:   Yes, they are.
>
> Q:   Why would that be?

A:   They are protecting Teresa and their mom.

. . . .

Q:   Sir, you heard her testify saying she didn't want anything to do with you. And her mother also testified, as did her father and her brother, that in no uncertain terms you were told to leave the house and that she didn't want anything to do with you. So, again, you are telling us that they are lying and you are telling the truth. Is that right?

A:   Yes.

. . . .

Q:   Sir, you heard Teresa and Dolores testify about what happened. Their stories were completely different. They testified under oath as to completely different circumstances of the attack. You heard that, didn't you?

A:   Yes.

Q:   So both of them were lying and you are telling the truth?

A:   Yes.

These questions from the prosecutor were therefore improper under our case law, because they compelled Ramirez to offer his opinions as to the veracity of other witnesses. *See Geston*, 299 F.3d at 1136. Ramirez's counsel, however, failed to object to the improper questions. We therefore review for plain error under Federal Rule of Criminal Procedure 52(b). *See Olano*, 507 U.S. at 730.

### 1. Review Under the Plain Error Standard

#### a. No Duty of Court Sua Sponte to Exclude Testimony

"Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." *Estelle v. Williams*, 425 U.S. 501, 512 (1976) (noting that some prisoners wish to wear prison clothes as a defense tactic designed to elicit sympathy from the jury).

In this case, Ramirez's counsel chose not to object to the questioning. Ramirez's counsel's failure to object could have been part of a legitimate defense strategy. Had Ramirez's counsel asked Ramirez why he thought the other witnesses were lying, the prosecutor could have successfully objected because the question called for speculation. Thus, the only way Ramirez's counsel could get the answer admitted into evidence, if it was useful to the defense, was by not objecting when the prosecutor asked Ramirez why he thought the other witnesses were lying. Regardless of whether Ramirez's counsel chose not to object for a strategic reason or because of an ignorance of the law, Ramirez is bound by the decision of his counsel not to object. *See Garrison v. McCarthy*, 653 F.2d 374, 378 (9th Cir. 1981).

[10] The district court had no duty to object sua sponte to the prosecutor's questions or to Ramirez's testimony when Ramirez's counsel elected not to do so. The district court appropriately declined to question Ramirez's counsel's trial strategy. *See United States v. Mitchell*, 502 F.3d 931, 968 (9th Cir. 2007) (holding that testimony was "not so plainly inflammatory that it should have been excluded sua sponte"). The district court could have perceived, for example, that counsel wanted Ramirez's testimony about the veracity of other wit-

nesses properly admitted as evidence. Accordingly, the district court did not abuse its discretion by allowing Ramirez's opinion testimony to be admitted into evidence. *See United States v. Mendoza-Paz*, 286 F.3d 1104, 1113 (9th Cir. 2002).

**[11]** Lastly, the district court's failure to exclude Ramirez's testimony was also not plain error. *See United States v. Wagner*, 834 F.2d 1474, 1483 (9th Cir. 1987); *United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979).

### b. Lack of Prejudice

**[12]** Ramirez also has not demonstrated that he was prejudiced by the admission of his testimony, regarding the veracity of other witnesses, in response to the prosecutor's improper questions. *See Olano*, 507 U.S. at 734. Ramirez cannot demonstrate that he was prejudiced because there was other, overwhelming evidence of his guilt. *See Weygandt v. Ducharme*, 774 F.2d 1491, 1493 (9th Cir. 1985) (noting that "[a]lthough [the defendant's] attorney should have objected to the prosecutor's improper remarks, his failure to do so, evaluated in light of the overwhelming evidence of guilt presented at trial, did not so prejudice [the defendant] as to deprive him of a fair trial."); *Mitchell*, 502 F.3d at 968 (holding that "in light of the overwhelming evidence of guilt" it could not "possibly have been plain error, in the absence of a motion to strike," for the district court to allow the testimony).

The government presented direct evidence of Ramirez's guilt, which was corroborated by circumstantial evidence, physical evidence, and motive. Ramirez testified that he was armed when he went to the Valenzuela home and that he knew that Teresa's father and brother would not be there. Dolores had recently threatened to pursue criminal charges against Ramirez. Teresa had recently ended a relationship with Ramirez. After Ramirez arrived at the home, Dolores and Teresa were stabbed approximately 45 times by Ramirez. The treating trauma surgeon and a forensic pathologist both

confirmed that the stab wounds suffered by Dolores and Teresa were defensive wounds, consistent with their account of the attack.

[13] Thus, in light of the overwhelming evidence of guilt introduced at trial, the admission of Ramirez's testimony regarding the veracity of other witnesses was not plain error. The district court was in the best position to determine that Ramirez's testimony was neither unduly inflammatory nor prejudicial. *See United States v. Layton*, 767 F.2d 549, 554 (9th Cir. 1985); *Mitchell v. United States*, 213 F.2d 951, 956 (9th Cir. 1954). Ramirez has not met his burden of showing that he was prejudiced by the admission of his testimony regarding the veracity of other witnesses. Ramirez was not denied the right to a fair trial.

### 2. *Court's Discretion Not to Notice Plain Error*

Even if we believed that the trial court had committed plain error, the "prosecutor's improper questioning is not in and of itself sufficient to warrant reversal." *Geston*, 299 F.3d at 1136. "It must also be determined whether the prosecutor's actions 'seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice.' " *Id.* (quoting *Tanh Huu Lam*, 251 F.3d at 861).

Ramirez, however, has not demonstrated that the prosecutor's improper questions were serious enough to constitute a miscarriage of justice. *See Geston*, 299 F.3d at 1136. The prosecutor's questioning about whether other witnesses were lying played a small part in the trial. The jury heard very few questions and answers regarding the veracity of other witnesses during the prosecutor's cross-examination of Ramirez, all of which were unnecessary in light of Ramirez's entire testimony. The prosecutor did not repeat or reference Ramirez's comments during closing argument. *Cf. Combs*, 379 F.3d at 574 (noting that "the prosecutor revived the error in her clos-

ing argument by explicitly referencing the prejudicial testimony" and that "[b]y reemphasizing this testimony immediately before the jury entered deliberations, the prosecutor herself destroyed any chance that the jury forgot about the error or viewed it as an unimportant, isolated incident").

**[14]** We therefore hold that, when viewed in the context of the entire trial, the prosecutor's actions were not serious enough to constitute a miscarriage of justice. *See Geston*, 299 F.3d at 1136.

## CONCLUSION

We hold that the district court did not err by not dismissing for lack of jurisdiction. We also hold that the district court did not abuse its discretion when it declined to require that the jury return a special verdict form, and that the district court did not plainly err by referring the jury back to the original jury instructions rather than giving the jury a supplemental instruction. Lastly, we hold that the prosecutor's improper questions and the admission of Ramirez's testimony regarding the veracity of other witnesses, did not deny Ramirez of his right to a fair trial.

**AFFIRMED.**